Present:   Koontz, Kinser, Lemons, and Agee, JJ., and
           Carrico, Compton, and Russell, S.JJ.

JUDICIAL INQUIRY AND REVIEW
COMMISSION OF VIRGINIA

v.   Record No. 042306   OPINION BY JUSTICE CYNTHIA D. KINSER
                                        April 22, 2005

PAUL M. PEATROSS, JR., JUDGE OF THE
SIXTEENTH JUDICIAL CIRCUIT


     Pursuant to Article VI, Section 10 of the Constitution

of Virginia, the Judicial Inquiry and Review Commission

(the Commission), filed a complaint in this Court against

Paul M. Peatross, Jr., judge of the Sixteenth Judicial

Circuit.  The Commission alleged that certain charges

against Judge Peatross for violating the Canons of Judicial

Conduct for the Commonwealth of Virginia (the Canons), Va.

Sup. Ct. R. Part 6, § III, were well-founded and of

sufficient gravity to warrant censure or removal.[1]  This

Court conducted "a hearing in open court."  Va. Const. art.

VI, § 10.  We conclude that there is not clear and

convincing evidence that Judge Peatross engaged in either

"misconduct while in office" or "conduct prejudicial to the

---

[1] Rule 2M of The Rules of the Judicial Inquiry and
Review Commission (Commission Rules) states that the term
" '[w]ell [f]ounded' shall mean that the Commission has
found based upon clear and convincing evidence and
supported by facts and sound judgment that the misconduct
has occurred."  See 15 VAC 10-10-10.

proper administration of justice." Id.  Therefore, we will

dismiss the complaint.

I.  FACTS AND PROCEEDINGS

The Commission issued two notices, one dated April 15,

2004, and the other dated July 13, 2004, stating charges

that Judge Peatross had engaged in misconduct while in

office and had engaged in conduct prejudicial to the

administration of justice.[2]  The Commission conducted a

formal hearing on each notice at which the Commission and

Judge Peatross presented evidence.[3]  Thereafter, the

Commission issued orders dated September 21, 2004, and

October 12, 2004, respectively, in which it set forth its

findings and conclusions of law.  In each instance, the

Commission directed that a formal complaint be filed in

this Court, seeking Judge Peatross' censure or removal from

office.  We will address the charges, the evidence adduced

at the formal hearings, and the Commission's findings with

respect to each of the notices.

A. April Notice

---

[2] Commission Rule 2L provides the term " '[c]harge' shall mean an Inquiry that the Commission determines, after a preliminary investigation by counsel and upon the recommendation of counsel, could be a violation of the Canons of Judicial Conduct or the basis for retirement, censure, or removal of a judge."

[3] The formal hearings took place on June 8, 2004, and September 21, 2004, respectively.

2

In the April notice, the Commission charged Judge Peatross with violating Canons 1, 2, 2A, 3B(2), 3B(4) and 3B(7).  The charges arose out of Judge Peatross' handling of three separate criminal cases in the Circuit Court of Albemarle County: (1) Commonwealth v. Nakesha A. Mills; (2) Commonwealth v. Aimee J. Jacques; and (3) Commonwealth v. Matthew C. Rexrode.  We will address these cases seriatim.

### 1. Commonwealth v. Mills

In Mills, the defendant was charged with attempt to obtain money by false pretense.  On September 12, 2003, the defendant appeared before Judge Peatross for the purpose of entering a guilty plea to the charge.  During the plea colloquy, the defendant seemed uncertain about how to respond to some of the questions asked by Judge Peatross.  Consequently, Judge Peatross allowed the defendant and her attorney, James Hingeley of the public defender's office, to converse privately in an office outside the courtroom.  The Commonwealth's Attorney, James L. Camblos, III, followed them into that office.  Camblos told Hingeley that he had decided to reduce the defendant's charge to a misdemeanor because of her favorable appearance, good attitude, and lack of prior criminal record.

When the parties returned to the courtroom, Camblos announced to Judge Peatross that he wanted to reduce the

3

felony to a misdemeanor. Judge Peatross did not allow the reduction in the charge but, instead, gave the Commonwealth's Attorney the option either to nolle prosequi the charge or to proceed with the felony. The Commonwealth's Attorney refused to choose either option. Judge Peatross then entered an order, sua sponte, to nolle prosequi the charge.

At the hearing before the Commission, Judge Peatross explained that, in his opinion, the Commonwealth's Attorney should have moved to reduce the charge before arraignment rather than doing so after the defendant had already entered a guilty plea to the felony. He further stated that, if the Commonwealth's Attorney intended to handle the charge as a misdemeanor, he should have done so earlier in the general district court. Judge Peatross indicated that he did not favor a policy that circumvented the general district court where misdemeanor charges should be tried. Judge Peatross also acknowledged that he had never previously entered a nolle prosequi on his own motion but believed when he did so that either the Commonwealth or the court could make such a motion. In his answer to the charges filed by the Commission and in his testimony, Judge Peatross, however, admitted that his understanding of the law was wrong, and that, under Virginia law, a judge has no

4

authority to enter a nolle prosequi except upon motion of the Commonwealth.

After the Mills case was concluded, Camblos wrote a letter to Judge Peatross expressing his reluctance to make suggestions to the court because of what Camblos termed an "angry reaction" from the judge. Camblos, nevertheless, wrote that he viewed Judge Peatross as consistent, thorough in his analysis, and fair. Judge Peatross replied, in a letter to Camblos, that his responses in court were not personal but that he simply wanted to operate the court in an efficient manner. Judge Peatross believed that Camblos' handling of the Mills case had not been efficient. Judge Peatross also stated that "[c]ircuit [c]ourt is not where this [c]ourt wants to handle misdemeanor cases, unless they occur at the same time as a felony, or come up on appeal."

Based on the evidence, including an audio recording of the Mills guilty plea hearing, the Commission found that Judge Peatross had nolle prosequied a felony charge without authority to do so and that he took such action because of his "displeasure and impatience" with the request by the Commonwealth's Attorney and the defendant's attorney to reduce the felony to a misdemeanor. The Commission further found that the "judge's uncivil behavior toward the attorneys was greatly disproportionate to any action or

5

inaction by the attorneys."  Finally, the Commission found that Judge Peatross had established a policy that he would not hear misdemeanor charges in his court unless they were companion cases to one or more felony charges against the same defendant.  The Commission concluded that Judge Peatross' actions in handling the Mills case violated Canons 1, 2, 2A, 3B(2), and 3B(4).

## 2. Commonwealth v. Jacques

In Jacques, the defendant was charged with robbery, use of a firearm in the commission of robbery, one felony charge of failure to appear in the Circuit Court of Albemarle County, and four misdemeanor charges of failure to appear.[4]  On December 10, 2003, six days before Jacques' scheduled jury trial, the Commonwealth's Attorney, Camblos; the defendant's attorney, Llezelle A. Dugger; and the defendant met in Camblos' conference room to discuss the terms of a possible plea agreement.  The parties eventually signed an agreement in which the defendant agreed to plead guilty to the robbery and firearm charges with certain recommended sentences.  According to Camblos, Dugger asked him about the felony failure to appear charge, and Camblos

---

[4] One of the misdemeanor charges was dismissed as being duplicative of the felony failure to appear charge.

6

told her that he did not care about that charge, stating, "I will ask the judge to nol pros it."

Camblos, with Dugger's permission, then took the plea agreement to Judge Peatross' office.[5]  Judge Peatross looked at the agreement and asked Camblos to explain its terms. After Camblos did so and also described the evidentiary difficulties he would have in trying the case, Judge Peatross indicated that the plea agreement seemed

---

[5] Judge Peatross was asked at the Commission hearing about what policy, if any, he had regarding plea agreements being presented to him.  He answered:

> I have no policy regarding plea agreements. I have no requirement or policy about reviewing plea agreements in advance.  If a plea agreement is reached in a case, what normally happens is the attorneys will send it to my office for me to look at in camera without any attorneys there, or I may see it in chambers right before I go out to arraign.  I do not review plea agreements, I do not discuss plea agreements, I do not negotiate plea agreements.
>
> I challenge them to give me any case where I have reviewed a plea agreement before trial in chambers, or anywhere, and rejected it and then go out and hear it.  It simply has not happened.
>
> I will agree that attorneys may have come to me and say here is a plea agreement, will you accept it or reject it, and I may give them indication of feeling, but I don't formally act on it.  That's against the Rule, and I need to go [into] court and review the plea agreement with the defendant on the record.
>
> If I am reviewing plea agreements in chambers and negotiating them, that's in violation of the Rule and I have no business being a judge.

7

reasonable but asked what was happening with the failure to appear charges. According to Judge Peatross' testimony at the Commission hearing, Camblos stated that he had forgotten about those charges and needed to talk to Dugger about them. Camblos, however, testified at the Commission hearing that he told Judge Peatross that he had agreed to nolle prosequi the felony failure to appear charge. According to Camblos, Judge Peatross stated he did not want the charge disposed of in that manner and "flicked" the plea agreement across the table to Camblos.

After leaving Judge Peatross' chambers, Camblos took the plea agreement back to Dugger and explained what had occurred. The defendant and the two attorneys then entered into a second plea agreement. This agreement retained the original terms of the first agreement as to the robbery and firearm charges but added a provision stating that the felony failure to appear charge would be tried by a jury on December 16, 2003. The terms of the second plea agreement also provided that the defendant would plead guilty to the misdemeanor failure to appear charges with the sentences to "be at the discretion of the court."

Later that same day, Judge Peatross, at the request of Camblos and Dugger, convened a hearing to take the defendant's guilty pleas. During that hearing, Judge

8

Peatross accepted and signed the second plea agreement, which contained a statement "[t]hat no [j]udge of the [c]ircuit [c]ourt has participated in any discussion leading to this Agreement under Rule 3A:8." On the robbery and firearm convictions, Judge Peatross sentenced the defendant in accordance with the terms of the plea agreement. As to the three misdemeanor failure to appear convictions, Judge Peatross sentenced the defendant to 12 months in jail on each charge, with the sentences to run consecutively.

The next day, Camblos delivered to Judge Peatross a letter stating that he "had agreed to ask for a nol prosse on [the felony failure to appear charge] when we entered into the plea agreement." Camblos also tendered a proposed order, which had been endorsed by Dugger, entering a nolle prosequi of the felony failure to appear charge. Camblos testified at the Commission hearing that, when he entered into the second plea agreement, he intended to go forward with a jury trial on the felony failure to appear charge. He changed his mind, however, because he believed that Judge Peatross' sentences on the misdemeanor failure to appear convictions were "extremely excessive and way beyond what was right or proper."

9

In his testimony at the Commission hearing, Judge Peatross explained his rationale for the sentences he imposed on the misdemeanor convictions:

> The 12-month sentence on each of the misdemeanors, or 36 months, meant an actual sentence of 9 months. . . . [M]y thinking was that if the jury gave a harsh sentence on the felony failure to appear, I could suspend that 36 months.  If the jury did nothing to him, I thought that a 9-month sentence for four failure to appears, if he is guilty on the felony failure to appear, was a fair sentence, so I didn't think I was giving a harsh sentence, and I left it within my discretion to adjust it if the jury gave a harsh sentence on the felony failure to appear, which could be up to 5 years.

Judge Peatross subsequently convened a hearing on December 15, 2003, to discuss Camblos' letter and the proposed nolle prosequi order.  During questioning by Judge Peatross about the change in how the felony failure to appear charge was to be handled, Camblos explained that the reference in his letter to "the plea agreement" was to the first agreement.  Camblos avowed to Judge Peatross that, when the second plea agreement was entered into and accepted by the court, there was no separate agreement to move for a nolle prosequi of the felony failure to appear charge.

During that hearing, Dugger indicated to Judge Peatross that she agreed with the contents of Camblos' letter but understood the letter to refer to the first plea

agreement. Like Camblos, she stated that, when the court accepted the second plea agreement, there was no agreement concerning the felony failure to appear charge other than to try it before a jury. She first learned of the proposed change in disposition the next morning, when she received a telephone call from Camblos asking her to endorse an order entering a nolle prosequi of the charge. At the Commission hearing, Dugger testified that she and Camblos had already reached their oral agreement about the felony failure to appear charge when she and the defendant signed the first plea agreement but later stated that there was no such oral agreement at that time. In any event, she acknowledged that the first plea agreement did not represent the total agreement between the parties.

At the conclusion of the December 15, 2003 hearing, Judge Peatross stated orally from the bench that he was going to remove both attorneys as counsel of record in the Jacques case. Subsequent to the hearing, Camblos and the defendant filed separate motions to reconsider.[6] Camblos again asserted that the plea agreement mentioned in his December 11, 2003 letter to Judge Peatross referred to the initial agreement and not the second one. In his motion,

---

[6] James Hingeley, who was Dugger's superior at the public defender's office, filed the motion on behalf of the defendant.

11

the defendant argued that the court had no lawful basis to remove Dugger as his defense counsel and that the removal and delay in his trial was prejudicial to him.

On January 6, 2004, Judge Peatross entered an order removing Camblos "as counsel for the Commonwealth" and Dugger "as counsel for the [d]efendant" because of their "misrepresentation" to the court concerning the disposition of the felony failure to appear charge. The next day, he denied both motions to reconsider. Judge Peatross explained at the Commission hearing that he took those actions because he had concluded that Camblos and Dugger had violated the plea agreement by submitting an order which <u>nolle prosequied</u> the felony failure to appear charge. He believed that, if Camblos had merely changed his mind, Camblos should have filed a motion to amend the plea agreement.

Judge Peatross also entered an order on January 7, 2004 dismissing the felony failure to appear charge without prejudice. The order stated:

> It appearing to the [c]ourt that the [c]ourt had good cause to relieve the Commonwealth's Attorney and [c]ourt appointed counsel for the [D]efendant from the case for misconduct in misrepresenting facts concerning the December 10, 2003 plea agreement to the [c]ourt and, through no fault of the Defendant, it appears the Defendant has been or may be denied a right to a speedy trial because of the misconduct.

12

Neither this order nor the January 6, 2004 order was endorsed by Camblos or Dugger, nor were the orders sent to them.[7]

On January 20, 2004, Judge Peatross received an undated letter from the defendant, asking about the status of his plea agreement and claiming that he had been "assured that all the failure to appear charges would be overlooked." On the same day, Judge Peatross responded by letter to the defendant and enclosed three orders pertaining to the case along with the plea agreement. Judge Peatross stated in the letter that the orders should answer the defendant's inquiries. Judge Peatross did not provide copies of the correspondence between him and the defendant to either Camblos or Dugger. Judge Peatross testified at the Commission hearing that he did not do so because he had removed both counsel from the case.

Based on this evidence, including an audio recording of the December 15, 2003 hearing concerning the proposed order to nolle prosequi the felony failure to appear charge, the Commission found the evidence contradictory concerning the in-chambers conversation between Camblos and Judge Peatross with regard to the first plea agreement.

_____

[7] Hingeley, on behalf of the defendant, filed a second motion to reconsider after entry of the January 7 order. Judge Peatross denied the motion.

13

The Commission resolved the credibility issue adversely to Judge Peatross and found that "the prosecutor did inform the judge in chambers on December 10, 2003, that he had an oral agreement with defense counsel to nolle prosequi the felony [failure to appear] charge and that the judge did inform the prosecutor that he would not accept any agreement that purported to nolle prosequi that charge." The Commission thus concluded that, when Judge Peatross executed the second plea agreement, thereby representing that he had not participated in any discussions leading to the agreement, he "knew, or reasonably should have known, that such representations were untrue."

The Commission further found that, while Judge Peatross did not require plea agreements to be previewed by him, he nevertheless "countenanced and encouraged" such a practice. Continuing, the Commission found that Judge Peatross had acted vindictively and in retaliation against Jacques by imposing the maximum sentence on each of the misdemeanor failure to appear charges; that, as admitted by Judge Peatross in his answer, he did not give either Camblos or Dugger notice that he was contemplating their removal from the Jacques case; that, when Judge Peatross entered the January 6, 2004 order, neither Camblos nor Dugger had notice that he was considering a finding that

14

they had made a misrepresentation to the court; that Judge Peatross did not afford Camblos or Dugger notice that they were charged with professional misconduct or a meaningful opportunity to defend themselves against such a charge, and did not take any steps to have the January 6, 2004 and January 7, 2004 orders delivered to the attorneys; that Judge Peatross had no authority to make a finding of misconduct or to remove the Commonwealth's Attorney; that Judge Peatross took substantive action in the Jacques case during a time when neither party was represented by counsel; that Judge Peatross' decision to remove the two attorneys and find them guilty of misconduct was in retaliation for the motion to nolle prosequi the felony failure to appear charge; that Judge Peatross received two ex parte letters from the defendant and responded to one of the letters without providing copies of the defendant's letters or the response to either counsel and without notifying the Commonwealth that such ex parte communications had occurred.[8]  Based on these findings, the Commission concluded that Judge Peatross had violated Canons 1, 2, 2A, 3B(2), and 3B(7).

---

[8] Judge Peatross received the second letter on December 10, 2003.

15

### 3. Commonwealth v. Rexrode

The Rexrode case was set for docket call on February 2, 2004. The public defender representing the defendant had filed a motion for a continuance of the scheduled trial date of March 3, 2004 because she had to be out of town during the week of March 1 to care for her terminally ill father. The public defender who was present at docket call, James Hingeley, renewed the motion for a continuance. Judge Peatross granted the motion and continued the trial to March 17, 2004.

Later during docket call, as a result of further discussions with the Commonwealth's Attorney, Camblos, Hingeley realized that the Rexrode case was complicated and therefore the new trial date might not give the defendant's attorney sufficient time to prepare after returning to the office. Hingeley approached Judge Peatross and moved for a later trial date. According to Camblos and Hingeley, Judge Peatross, in a courtroom filled with lawyers and litigants, then asked Hingeley with irritation, sarcasm, and anger while throwing his hands in the air to tell the court what day he wanted. Despite his reaction, Judge Peatross continued the trial to a later date. At the Commission hearing, Judge Peatross admitted that he owed the public

defender an apology because his conduct was "wrong[,] . . . unjustified[,] . . . unprofessional [and] uncalled for."

Based on the evidence, an audio recording of the February 2, 2004 docket call, and Judge Peatross' answer admitting the Commission's allegations in the Rexrode matter, the Commission found that Judge Peatross' conduct toward the public defender, Hingeley, was "extremely impatient, undignified and discourteous" and that he acted in retaliation because the public defender's office had filed two motions asking Judge Peatross to recuse himself in two unrelated cases due to the judge's conduct in Jacques. The Commission concluded that Judge Peatross' actions violated Canons 1, 2, 2A, and 3B(4).

### B. July Notice

The July notice charged Judge Peatross with violating Canons 1, 2, and 2A. The charges arose out of a conversation Judge Peatross had with the Chief Justice of the Supreme Court of Virginia.

On June 21, 2004, Judge Peatross attended a meeting of the Judicial Council of Virginia in Richmond, of which he was a member. After the close of the meeting, Judge Peatross had a private conversation with the Chief Justice in order to tender his resignation from the Judicial Council and to explain that he was resigning due to the

17

Commission's findings with regard to the charges brought in the April notice. The Chief Justice immediately inquired whether the Commission's findings would be presented to this Court. Judge Peatross answered that he had no expectation or intention that the matter would come before this Court. At that time, Judge Peatross intended to accept the terms of an agreement proposed by the Commission disposing of the April charges in exchange for the Commission's not filing a formal complaint in this Court.

During the conversation with the Chief Justice, Judge Peatross discussed some facts surrounding the charges and one of the terms of the proposed agreement with the Commission. After his conversation with the Chief Justice, Judge Peatross saw the actual written agreement and learned for the first time about some conditions with which he would have to comply that had not been mentioned orally by the Commission at the close of the hearing on the April charges. Some days later, Judge Peatross decided not to enter into the agreement with the Commission disposing of the April charges and relayed this decision to his attorney on July 9, 2004.

Based on this evidence, the Commission found that Judge Peatross misrepresented to the Chief Justice that the matter before the Commission was concluded and would not be

18

coming before this Court, and that Judge Peatross engaged in an ex parte conversation with the Chief Justice about an impending case.  The Commission concluded that Judge Peatross' actions violated Canons 1, 2A, and 3B(7).

## II.  CANONS

The relevant portions of the Canons at issue in this case state the following:

### Canon 1

A Judge Should Uphold the Integrity and Independence of the Judiciary.

### Canon 2

A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities.

A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

### Canon 3

A Judge Shall Perform The Duties Of Judicial Office Impartially And Diligently.

. . . .

B.(2) A judge shall be faithful to the law and maintain professional competence in it.

. . . .

B.(4) A judge shall be patient, dignified and courteous to litigants, jurors, witnesses,

19

lawyers and others with whom the judge deals in an official capacity . . . .

. . . .

B.(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law.  A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:
(a) Where circumstances require, ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:
(i) The judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and
(ii) The judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.

### III.  ANALYSIS

Upon the filing of a formal complaint by the Commission, this Court is charged with the duty to conduct a hearing in open court to determine whether a judge has "engaged in misconduct while in office, or . . . has persistently failed to perform the duties of [the] office, or . . . has engaged in conduct prejudicial to the proper administration of justice."  Va. Const. art. VI, § 10.  We make that determination by considering the evidence and making factual determinations de novo.  Judicial Inquiry &

20

Review Comm'n v. Lewis, 264 Va. 401, 405, 568 S.E.2d 687, 689 (2002).  Contrary to the Commission's argument, we do not give "due weight" to the Commission's findings or their credibility determinations.  Instead, we accord the Commission's findings only such weight, if any, as we deem appropriate in each case.  This is so because the Commission's function is only to determine whether "the charges [are] well-founded, and sufficient to constitute the basis for retirement, censure, or removal of a judge," thus resulting in a complaint being filed in this Court. Code § 17.1-902; see also Va. Const. art. VI, § 10.

In this type of case invoking the Court's original jurisdiction, see Va. Const. art. VI, § 1, we independently review the record created by the Commission and determine whether there is clear and convincing evidence of a violation of the Canons as charged in the complaint filed by the Commission.  See Lewis, 264 Va. at 405, 568 S.E.2d at 689.  If we find such clear and convincing evidence, we are required to censure the judge or remove him/her from office.  Va. Const. art. VI, § 10.  Those are the only sanctions available to the Court.

The term "clear and convincing evidence" means "that degree of proof which will produce in the mind of the trier of facts a firm belief as to the allegations sought to be

21

established.  Such measure of proof is intermediate, more than a mere preponderance but less than is required for proof beyond a reasonable doubt; it does not mean clear and unequivocal." Middleton v. Johnston, 221 Va. 797, 803, 273 S.E.2d 800, 803 (1981) (citing Fred C. Walker Agency v. Lucas, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975)); accord Lewis, 264 Va. at 405, 568 S.E.2d at 689.  The Commission has the burden to prove by clear and convincing evidence the charges brought to this Court.  Lewis, 264 Va. at 405, 568 S.E.2d at 689.

## A. April Charges

Judge Peatross admitted many of the facts alleged in the April notice.  He conceded that, in the Mills case, he lacked authority under Virginia law to nolle prosequi a criminal charge except upon motion of the Commonwealth.  In the Jacques case, Judge Peatross admitted that he did not give notice to Camblos or Dugger that he was considering their removal from the case prior to doing so.  Likewise, he acknowledged that he sent a letter, along with three orders, to Jacques without providing copies of the correspondence to Camblos or Dugger.  Finally, in the Rexrode case, Judge Peatross stated that he owes Hingeley an apology for his reaction to the second request for a continuance of the trial date.  Although Judge Peatross

22

admitted these facts, he maintains that his actions in all three cases neither constituted judicial misconduct nor prejudiced the proper administration of justice.

The main factual dispute concerned the in-chambers conversation between Judge Peatross and Camblos about the first plea agreement in Jacques.  The Commission resolved the credibility issue adversely to Judge Peatross, basing its decision primarily on Judge Peatross' demeanor as gleaned from the audio recordings of the criminal proceedings in Mills, Jacques, and Rexrode.  The Commission also cited Judge Peatross' failure to take issue with Camblos' December 15, 2003 in-court representations about what had transpired earlier in Judge Peatross' chambers with regard to the first plea agreement, the consistency between Camblos' in-court representations and his report to Dugger concerning the conversation with Judge Peatross, and both counsel's preparations for the upcoming jury trial on the felony failure to appear charge after Jacques pled guilty to the other charges.

We have listened to the audio recordings of the three criminal proceedings forming the basis of the April charges.  Contrary to the Commission's findings and argument before this Court, those recordings do not even remotely provide clear and convincing evidence of a

23

violation of the Canons, specifically Canon 3B(4), in either Mills or Rexrode. Judge Peatross' demeanor, in all three criminal proceedings, was stern, direct, and authoritative but not "uncivil" or "extremely impatient, undignified and discourteous," as found by the Commission.

It is true that, during the docket call in Rexrode, Judge Peatross exhibited some exasperation, but he had reason to do so given Hingeley's vacillation about the length of the needed continuance. Also, Judge Peatross acknowledged at the Commission hearing that, as a result of the two recusal motions filed by the public defender's office, he felt that he was being falsely accused and unfortunately took that feeling out on Hingeley. There is, however, no evidence that Judge Peatross acted in retaliation for the two recusal motions. Moreover, Judge Peatross recognized that he should apologize to Hingeley for his demeanor on that occasion.

Not only do the audio recordings fail to provide proof of any violation of the Canons, they do not support the Commission's credibility findings adverse to Judge Peatross. Based on our independent review of the record, we find no reason to reject the testimony of Judge Peatross, Camblos, or Dugger. Instead, we believe that each testified honestly about his or her recollection of

24

the events surrounding the first and second plea agreements in the Jacques case and that the differences in their testimonies reflect an unfortunate misunderstanding between Judge Peatross and Camblos, which was complicated by prior disagreements between them.

Contrary to the Commission's finding, Judge Peatross, during the December 15, 2003 hearing, did not totally fail to challenge Camblos' representations about the in-chambers conversation regarding the first plea agreement. For example, the following colloquy demonstrates that Judge Peatross did assert his recollection of that conversation:

> THE COURT:  You had brought me a plea agreement that dealt with the robbery and the use of the firearm.
>
> MR. CAMBLOS:  That's right.
>
> THE COURT:  And there were other pending charges –
>
> MR. CAMBLOS:  Right.
>
> THE COURT:  – and I asked you to take those up –
>
> MR. CAMBLOS:  Yes.
>
> THE COURT:  – and you went back and did that?
>
> MR. CAMBLOS:  That's correct.

In addition, Judge Peatross explained at the Commission hearing that he did not want to engage in "a shouting match

with [Camblos]" by challenging Camblos' version of the in-chambers conversation.  Indeed, the audio recording of the December 15, 2003 hearing reflects that Judge Peatross did not do so.

Thus, we conclude that the evidence as to the in-chambers discussion about the first plea agreement was in equipoise.  That conclusion means that there is not clear and convincing evidence to prove the charge that Judge Peatross knew or should have known that his representation that he had not participated in discussions leading to the second plea agreement was untrue.  We reach the same result as to the charge that Judge Peatross countenances a practice requiring all plea agreements to be approved by him in advance.  Our holding on these charges should not be viewed as approving any practice that involves a trial judge in the negotiations leading to a plea agreement or that requires parties to submit a plea agreement to a judge for approval before tendering the agreement in open court. See Rules 3A:8(c)(1)(C) and (c)(2).  Instead, our holding simply reflects the lack of clear and convincing evidence in this case.

We further find Judge Peatross was not without justification in being frustrated and perplexed about the inconsistency between the terms of the Jacques second plea

26

agreement stating that the felony failure to appear charge would be tried by a jury and the subsequent order, signed by both counsel, which nolle prosequied the charge. Camblos presented that order to Judge Peatross, along with the letter stating that Camblos had agreed to that disposition when the parties entered into "the plea agreement," one day after Jacques had entered guilty pleas to the other charges. All this was preceded by the initial plea agreement that did not address all the charges pending against Jacques. Thus, we conclude that there is not clear and convincing evidence that Judge Peatross retaliated for the motion to nolle prosequi the felony failure to appear charge by removing Camblos and Dugger from the case and finding that they had engaged in misconduct. It may be that Judge Peatross did not have sufficient grounds to warrant his finding, especially as to Dugger. But, we decide only whether his conduct violated the Canons, and it did not.

We do recognize that Judge Peatross, as he admitted, removed Camblos and Dugger from the Jacques case without any notice to them that he was considering such action. We also find that he failed to provide them with notice that he was contemplating a finding of misconduct and that he did not take any steps to inform either attorney that the

27

January 6, 2004 and January 7, 2004 orders had been entered.  These omissions were, however, errors of law, not violations of the Canons.  See Oberholzer v. Comm'n on Judicial Performance, 975 P.2d 663, 680 (Cal. 1999) (finding that "[m]ere legal error, without more, . . . is insufficient to support a finding that a judge has violated the Code of Judicial Ethics"); see also Harrod v. Illinois Courts Comm'n, 372 N.E.2d 53, 65 (Ill. 1977) ("to maintain an independent judiciary mere errors of law . . . should not be the subject of discipline").

We also note that both attorneys had the opportunity to explain their positions and answer Judge Peatross' questions at the December 15, 2003 hearing.  They also both filed motions to reconsider before Judge Peatross actually entered the January 6, 2004 and January 7, 2004 orders, and Hingeley filed another motion to reconsider after entry of the January 7, 2004 order.  Moreover, Judge Peatross, like any judge in Virginia, has the inherent right to supervise the conduct of attorneys practicing before him and to discipline an attorney who engages in misconduct, which includes the right to remove an attorney of record in a case.  Richmond Ass'n of Credit Men, Inc. v. The Bar Ass'n of Richmond, 167 Va. 327, 335, 189 S.E.2d 153, 157 (1937); Norfolk & Portsmouth Bar Ass'n v. Drewry, 161 Va. 833, 836,

172 S.E. 282, 283 (1934); Legal Club of Lynchburg v. Light, 137 Va. 249, 250, 119 S.E.2d 55, 55 (1923).

Judge Peatross also made errors of law in certain other respects. In Jacques, he should not have dismissed the felony failure to appear charge and responded to the defendant's ex parte letter at a time when neither the defendant nor the Commonwealth had an attorney of record in the case. He should have rectified that situation and provided proper notice before dismissing the case and answering the defendant's letter. He did, however, have both of Jacques' unsolicited letters placed in the defendant's court file, which was available to the Commonwealth's Attorney and the defendant's attorney. In Mills, Judge Peatross erred when he, sua sponte, entered a nolle prosequi of the felony charge. We do not condone any of those actions; they reflect legal errors by Judge Peatross. But, we cannot say that they rise to the level of clear and convincing evidence of a violation of the Canons that would warrant censure or removal from office. See In re: Inquiry Concerning a Judge, No. 207 Elton G. Tucker, 501 S.E.2d 67, 71 (N.C. 1998) ("judges may not be disciplined for errors of judgment or errors of law").

Continuing, we cannot find clear and convincing evidence that Judge Peatross acted vindictively in

29

sentencing Jacques on the misdemeanor failure to appear convictions. The second plea agreement clearly stated that the sentences to be imposed for those convictions were left to the sole discretion of Judge Peatross. The sentence on each conviction did not exceed the statutory maximum sentence allowed for that offense. See Code §§ 18.2-456 and 18.2-457; see also Yoder v. Commonwealth, 107 Va. 823, 832-33, 57 S.E. 581, 584 (1907) (finding a sentence of 15 days not in excess of the statute because "the limitation of [Code § 18.2-457] does not apply to the second, third, fourth and fifth classes into which [Code § 18.2-456] is divided").

The same is true with regard to the charge that Judge Peatross had a policy that he would not try misdemeanor charges unless they were companion cases to a felony charge against the same defendant. It is true that Judge Peatross believed that the general district court should not be circumvented with regard to the trial of misdemeanor charges and that to do so would not be an effective use of judicial resources. But, the evidence simply fails to show that he had established "a policy" against trying misdemeanor charges in the circuit court.

B. July Charges

30

Like many of the underlying facts forming the basis of the April charges, Judge Peatross did not dispute the factual allegations in the July notice. Judge Peatross admitted that he had a meeting with the Chief Justice in order to submit his resignation from the Judicial Council. During that meeting, he assured the Chief Justice that the matter pending before the Commission would not be coming before this Court and proceeded to discuss some of the facts surrounding the charges and one of the terms of the proposed agreement disposing of the April charges. The Commission, however, again chose to discredit Judge Peatross' testimony that, when he spoke with the Chief Justice, he fully intended to accept the Commission's proposed disposition of the April charges. The Commission thus found that Judge Peatross had "misrepresented to the Chief Justice that the matter before the Commission had been concluded in a manner so that it would not be coming before [this Court]."

Yet again, the record does not contain clear and convincing evidence to prove this charge. It is undisputed that Judge Peatross did not see the written agreement disposing of the April charges until after his meeting with the Chief Justice. It is also undisputed that the written version of the agreement contained conditions that were not

31

announced orally at the conclusion of the formal hearing on the April charges.  It was only after Judge Peatross saw the written agreement that he decided not to accept its terms.  We therefore conclude that Judge Peatross spoke truthfully when he told the Chief Justice that he had no expectation or intention that the matter would come before this Court.  Although Judge Peatross did discuss certain facts and details with the Chief Justice, that conversation, at the time it occurred, was not about an impending case.  Thus, Judge Peatross did not violate Canons 1, 2A, and 3B(7).

IV.  CONCLUSION

For these reasons, we hold that there is not clear and convincing evidence showing that Judge Peatross violated the specified Canons as charged.  We reiterate that some of Judge Peatross' actions in the various matters were the result of mistaken interpretations of the law and his authority thereunder, and some of his conduct did not exemplify the level of professionalism that judges in this Commonwealth should exhibit.  His actions and conduct were not, however, so egregious as to amount to judicial misconduct or conduct that was prejudicial to the proper

administration of justice warranting censure or removal

from office.  Therefore, we will dismiss the complaint.[9]

Dismissed.

---

[9] To the extent that we have not separately addressed each charge, each item of evidence, or each finding of the Commission, we have nevertheless considered all of the record in concluding that the Commission failed to prove by clear and convincing evidence that Judge Peatross violated the Canons as charged.  Our review included the testimony and letters in support of and in opposition to Judge Peatross.

In light of our disposition, it is not necessary to rule on Judge Peatross' motion to dismiss.