Present:  Lacy, Keenan, Koontz, Kinser, and Lemons, JJ., and Compton[1] and Russell, S.JJ.

JUDICIAL INQUIRY AND REVIEW
COMMISSION OF VIRGINIA
                                           OPINION BY
v.  Record No. 051990        JUSTICE LAWRENCE L. KOONTZ, JR.
                                         June 8, 2006
ARCHIE ELLIOTT, JUDGE
OF THE THIRD JUDICIAL DISTRICT


     Pursuant to Article VI, Section 10 of the Constitution of

Virginia and Code § 17.1-902, the Judicial Inquiry and Review

Commission of Virginia (Commission) filed a complaint under the

original jurisdiction of this Court against Archie Elliott, a

judge of the General District Court of the Third Judicial

District.  In the complaint, the Commission alleges that there

are well founded grounds to support its determination that Judge

Elliott committed multiple violations of the Canons of Judicial

Conduct and that these violations are of sufficient gravity to

warrant the censure or removal from office of Judge Elliott.

                  PROCEEDINGS BEFORE THE COMMISSION

     "The Judicial Inquiry and Review Commission was created to

investigate charges that, if true, would warrant the retirement,

removal, or censure of a judge."  Judicial Inquiry and Review

Commission v. Lewis, 264 Va. 401, 403, 568 S.E.2d 687, 688

_____

     [1] Senior Justice Compton participated in the hearing and
decision of this case before his death on April 9, 2006.

(2002); see also Rules of the Judicial Inquiry and Review Commission, 15 VAC § 10-10-10, Rule 2(L).[2]  "When the Commission concludes, after investigation, that such a charge is well-founded, it may file a formal complaint, resulting in a hearing before this Court."  Lewis, 264 Va. at 403, 568 S.E.2d at 688; JIRC Rule 15(A)(2).  The rules of the Commission define the term "well founded" as meaning "that the Commission has found based upon clear and convincing evidence and supported by facts and sound judgment that the misconduct [by the judge] has occurred." JIRC Rule 2(M); see also Judicial Inquiry and Review Commission v. Peatross, 269 Va. 428, 433 n.1, 611 S.E.2d 392, 394 n.1 (2005).  If this Court "finds that the judge has engaged in misconduct while in office, or . . . has engaged in conduct prejudicial to the proper administration of justice, it shall censure [the judge] or shall remove [the judge] from office." Va. Const. art. VI, § 10.[3]

On August 26, 2004, the Commission entered an order suspending Judge Elliott, with pay, from the exercise of

_____

[2] Hereinafter, we will refer to the rules of the Commission as "JIRC Rule #."  Subsequent to the proceedings at issue here, the Commission's rules were amended effective February 14, 2006. None of the amendments are germane to the issues presented and, accordingly, we will refer to the current rules.

[3] Code § 17.1-906 specifically establishes the jurisdiction of this Court to include complaints filed against a judge of a district court by the Commission.

judicial powers. Code § 17.1-911(A). The suspension was based upon the Commission's finding that there was "probable cause to believe that the continued performance of judicial duties by Judge Elliott constitutes both a substantial and immediate threat to the public interest in the administration of justice." That order has not been terminated.

On October 18, 2004, the Commission issued formal notice advising Judge Elliott that he was being charged by the Commission with violating the Canons of Judicial Conduct based on 12 specified incidents. JIRC Rule 3(B)(2); JIRC Rule 8(A). On June 14 and 15, 2005, the Commission conducted an evidentiary hearing at which Judge Elliott appeared and was represented by counsel. JIRC Rule 13. At the conclusion of the hearing, the Commission advised Judge Elliott and his counsel that the Commission had decided unanimously that seven of the charged incidents in the notice were well founded and of sufficient gravity to warrant the filing of a formal complaint in this Court. JIRC Rule 15(A)(2). The charges against Judge Elliott that the Commission determined to be well founded are as follows:

1. On June 14, 2004, upon being advised that he was not elected as chief judge, Judge Elliott reacted in such an extremely angry manner that his two fellow judges reasonably believed that he might commit a physical assault.

3

2.  On June 16, 2004, Judge Elliott confronted a fellow judge in a loud and angry manner and verbally threatened him.

3.  On July 6, 2004, Judge Elliott sent letters with attachments to all of the district court judges in Tidewater, with copies to the Chief Justice and the Executive Secretary. The content and tenor of the material so distributed were calculated to embarrass and personally attack the two other judges of his court.

4.  On July 14, 2004, Judge Elliott inappropriately directed a loud and angry outburst at a member of his court staff.

5.  Judge Elliott has had a longstanding practice of telling defendants that he had a "DEA" light above the bench in his courtroom that detected whether they were using drugs. This tactic, that involved an intentional falsehood, often resulted in incriminating statements by defendants. Judge Elliott routinely would determine the defendants' sentences based upon whether the defendants were willing to take a drug test or would admit drug use without the necessity of a test.

6.  In a letter to the Chief Justice dated August 26, 2004, Judge Elliott falsely stated that he did not have a practice of reviewing defendants' criminal records prior to adjudicating the issue of guilt. Judge Elliott habitually considered such records prior to announcing a decision on the issue of guilt.

7.  In the same letter to the Chief Justice, Judge Elliott falsely stated that he had not prohibited the Commonwealth's Attorney's office from prosecuting cases in his courtroom. In February of 2002, Judge Elliott informed the Commonwealth's Attorney that he did not want a prosecutor in his courtroom for drunk driving cases and that, if a prosecutor were present, the conviction rate in such cases would be reduced.

However, the Commission further advised Judge Elliott that no formal complaint would be filed in this Court, and Judge Elliott would be permitted to resume the duties of his office under a supervision agreement pending his required retirement, if Judge Elliott abided by specific conditions set by the Commission for entering into that agreement. JIRC Rule 15(A)(4). As will become apparent, whether the Commission and Judge Elliott reached an agreement and, if so, whether that agreement was breached were central to the positions subsequently advanced by the parties on brief and in their oral argument before this Court. Accordingly, we will recount in some detail the actions of the Commission and Judge Elliott during and following the conclusion of the June 14-15, 2005 hearing.

After the Commission had heard extensive evidence, including considerable character evidence in favor of Judge Elliott, the Commission met in executive session to deliberate. After returning from the executive session, the Chairman of the Commission announced the Commission's findings, listing the charges upon which it found "clear and convincing evidence to forward to the Supreme Court for removal [or] censure." The Chairman then stated:

> [H]owever, pursuant to the provisions of [JIRC] Rule 15A(4), the Commission will offer you the conditions

that may forego the forwarding of those charges to the Supreme Court on the following specific terms:

1. That you submit a letter of retirement prior to December 31 of 2005, or such earlier date as is required to permit the General Assembly to select a successor. The effective date of that letter of retirement shall be not [later] than June 30, 2006.

2. That prior to any return to the bench, you shall write letters of apology to Judge Whitlow, Judge Morris and Renay Johnson. Those letters must be approved by counsel for the Commission and delivered prior to your return to the bench.

In addition, you will be required to write a letter, likewise approved by counsel for the Commission, to the Commonwealth Attorney Earle Mobley, acknowledging that the Commonwealth's Attorney, or his assistants, are welcome to attend your court and to prosecute DWI's.

3. You shall discontinue the practice of offering conditional sentences as was done with the DEA light circumstances.

4. That you discontinue and you may not in the future on any occasion review prior criminal history or records in advance of hearing the evidence and finding that the evidence was sufficient to support conviction, and you shall take steps to ensure that neither defendants nor counsel for the defendants have any misunderstanding with respect to your review of such records prior to hearing of the evidence on the substantive charge.

5. You will submit to supervision by a judge selected by the Commission on terms to be determined by counsel for the Commission and in consultation with the Chairman.

6. There is a set of form restrictions that have been approved by the Commission that include the necessity of not holding yourself out as being an expert in ethics, not conducting ethic[s] seminars, and some other details along those lines, we can provide you a copy of that.

> You may announce that you have been returned to the bench, that the resolution of the matters before the Commission [has] been such that you may return to the bench, but you may not publicly or privately, outside of your family and counsel, acknowledge or represent that you have been vindicated or a similar term by the Commission.
>
> These terms will be reduced to writing immediately. Acceptance by your signature to these written terms must be received by the Commission office, in the Commission office, which can be by fax at least, followed up immediately by the hard copy, not later than 12 o'clock noon on this coming Friday, June 17th.

The Chairman then asked Judge Elliott and his counsel whether they understood the terms of the offer for a JIRC Rule 15(A)(4) supervision agreement that he had just recited. Although Judge Elliott's counsel responded that he understood the terms, Judge Elliott stated that he did not because "[i]t was too much."

Counsel for the Commission indicated that the Commission could "have the conditions typed up by tomorrow." However, a Commission member insisted that the conditions be reviewed "[b]ecause there was one thing that was mentioned about if he accepted that offer, that once the offer has been accepted by signature, that" certain of the conditions would immediately be in force, including a condition that Judge Elliott would be required to expend annual leave until he returned to the bench.

The Chairman then summarized the substance of the Commission's offer again. With specific relevance to subsequent proceedings before the Commission and in this Court, the Chairman reiterated to Judge Elliott that "you may announce, after the hearing here, that the determination of the Commission was such that you have been returned to the bench, or are allowed to resume your role on the bench, but you shall not represent to anyone that you have been vindicated by the Commission." The Chairman again stated that "we have to receive your signed acceptance of these terms . . . not later than 12 o'clock Friday, June 17th [2005]."

On June 16, 2005, counsel for the Commission sent by telefacsimile to Judge Elliott's counsel a transcript of the chairman's oral recitation of the terms at the conclusion of the June 14-15, 2005 hearing. In addition, counsel for the Commission included a document styled "ACCEPTANCE OF CONDITIONS," which read as follows:

> By my signature below, as well as the signature of my attorney, I hereby accept the conditions specified by the Judicial Inquiry and Review Commission in the attached excerpt from the transcript of the Commission proceeding on June 15, 2005. I fully understand that, upon my acceptance of these conditions, I will be required to take certain actions including the signing of an agreement pursuant to Commission Rule 15 A (4) which will set forth the terms of a period of supervision in accordance with the conditions established by the Commission. I also understand that upon acceptance of the Commission's conditions, I will be required to take annual leave

8

until the Commission determines that I have satisfied the Commission's conditions for my return to the bench.

The acceptance of conditions included signature lines for Judge Elliott and his counsel, but no place for a countersignature by a representative of the Commission.

In a cover letter to the telefacsimile, counsel for the Commission stated "[s]o that you will have as much information as possible to help make the decision [to accept the Commission's conditions], I also am including copies of a draft . . . agreement that the judge _eventually_ will be required to sign in order to _effectuate the period of supervision_." (Emphasis added.)  This document specified that the anticipated period of supervision would commence upon the entry of an order by the Commission and "continue until the effective date of the judge's retirement which is to be not later than June 30, 2006 [and he] must announce his retirement no later than December 31, 2005."  Among other conditions set out in this document was a requirement that "Judge Elliott may not make any statements, and may not authorize or knowingly allow anyone to make statements, that reasonably may be construed as an assertion that he was exonerated or vindicated by the Commission."  This document included signature lines for Judge Elliott, his counsel, and counsel for the Commission.

Later on June 16, 2005, counsel for the Commission sent a further telefacsimile with an updated draft of the written agreement.  In a cover letter to this telefacsimile, counsel for the Commission stated that "the only thing that the judge and you need to sign by 5 p.m. tomorrow is the 'acceptance of conditions.' "  He reiterated his view that the draft document was intended "only to give [Judge Elliott's counsel] the general idea of what such . . . an agreement would look like." (Emphasis in original.)  Counsel for the Commission further indicated that he would "not sign the agreement on behalf of the Commission until the Chairman and/or the other members have had an opportunity to review the specific language."  (Emphasis in original.)

On June 17, 2005, counsel for the Commission by a further telefacsimile advised counsel for the judge that "if Judge Elliott signs the 'acceptance of conditions' . . . he is not to make any announcement about his status or his return to the bench until he has received clearance from the Commission and the suspension order has been lifted."  (Emphasis in original.) Counsel for the Commission indicated that he was making this further communication "[j]ust so there is no misunderstanding . . . I am just trying to make sure that we all are on the same page."  However, counsel did not indicate that he was making this directive at the request of the Commission, and it would

appear from the context that he was asserting his own recollection or interpretation of the Commission's offer as stated by the Chairman at the conclusion of the June 14-15, 2005 hearing.

On June 17, 2005, Judge Elliott and his counsel timely signed the Acceptance of Conditions. Over the next several weeks, Judge Elliott took steps to comply with those conditions. He drafted the required letters and submitted the drafts to the Commission. Upon finding the drafts to be insufficient, the Commission suggested changes in the wording of those drafts. Judge Elliott prepared and signed letters in accord with the Commission's proposed language and returned them to the Commission.[4]

On July 12, 2005, counsel for the Commission advised Judge Elliott's counsel that:

> At its meeting today, the Commission declined to sign off on the [JIRC] Rule 15A (4) agreement or to enter an order lifting Judge Elliott's suspension. Instead, the Commission asked me to invite both you and the judge to appear at the Commission's next meeting on August 9, 2005, at 8:30 a.m. The purpose of the appearance will be to discuss the Commission's concerns that you and/or Judge Elliott have not abided by the Commission's directives. No statements were to be made regarding the judge's return to the bench

---

[4] From July 8, 2005 until at least July 27, 2005, the judge was hospitalized and underwent surgery. The Commission was advised of this situation, and the judge was not found to be medically incapacitated from performing judicial responsibilities as a result of the surgery.

11

until after the Commission has approved the agreement and has rescinded the suspension order.  <u>No statements were to be made by the judge or his representatives that conveyed the idea that the Commission proceeding was resolved in a manner favorable to him.  The Commission has received credible information that such statements nevertheless have been made</u>.  Therefore, the Commission has determined that, until at least August 9, there will be no change in the status quo.

(Emphasis added.)

On August 9, 2005, the Commission held a hearing to determine whether Judge Elliott had failed to comply with the conditions set by the Commission before he would be permitted to return to the bench under supervision pending his retirement.  At that hearing, the Chairman[5] stated that the Commission had "gotten a lot of information since [the evidentiary hearing] indicating there have been several communications, by [Judge Elliott and his counsel], with various people indicating that [Judge Elliott] would be back [on the bench], and quite frankly, we are concerned with the constraint that has had on [the Commission] [e]ffecting a good transition."

The former Chairman stated that "it was abundantly clear that the results of the [evidentiary] hearing were not to be communicated" to anyone.  The former Chairman then asked whether

---

[5] Between the June 14-15, 2005 and August 9, 2005 hearings, the Commission, pursuant to Code § 17.1-901, had elected a new Chairman.  The former Chairman remained a member of the Commission and participated in the August 9, 2005 hearing in that capacity.

Judge Elliott or his counsel had communicated those results to anyone. Judge Elliott's counsel replied that they had not. The former Chairman then asked, "Have you made any comment to any person about whether you were pleased with the outcome or whether or not Judge Elliott was going to be coming back." Judge Elliott's counsel replied that he had "thanked [character witnesses for Judge Elliott at the evidentiary hearing] for their testimony, but I didn't tell them the results of the hearing." Counsel conceded, however, that his "demeanor might have indicated that [he] was pleased."

Counsel for the Commission then questioned Judge Elliott, focusing on whether he had told a particular lawyer and deputy sheriff "that he was coming back" to the bench. Judge Elliott testified that "three or four days after the [evidentiary] hearing" the deputy sheriff, who had served as a bailiff in Judge Elliott's court for a long time, called him and asked "how did things go." Judge Elliott further testified that he responded, "I can't say specifically how things went . . . but everything is going to be okay." Judge Elliott further testified that he saw the other individual, a local attorney, "in church" and, in response to a similar inquiry regarding the outcome of the hearing, told the attorney that "everything will be all right, everything is fine."

In response to repeated questioning by counsel for the Commission, Judge Elliott denied saying anything more than that "everything would be okay" or "everything would be all right." Although counsel for the Commission alluded to statements allegedly made to "a member of the Commission" by the identified lawyer and deputy sheriff, no affidavits of those individuals were presented and no other witnesses were called to testify. The Commission took no express action before the conclusion of this hearing.

Thereafter, counsel conducted a series of discussions regarding the provisions to be included in the written agreement contemplated in the "Acceptance of Conditions." Principally, those discussions focused on the provision providing for the date of the announcement of the judge's retirement and the effective date for that retirement. In a letter dated August 12, 2005 sent by telefacsimile and postal mail to Judge Elliott's counsel, the Commission's counsel indicated that he had "consulted with the Chairman [who had concluded] that we could not alter the terms of the Commission's proposal in a material fashion without taking the matter back to the full Commission." Counsel for the Commission then indicated that he had drafted "[a] revised proposed agreement" that permitted Judge Elliott to return to the bench before submitting notice of his retirement to the Chief Justice, but requiring him to do so

14

within one week thereafter.  Counsel for the Commission stated that he "believe[d] that the one-week window is a reasonable compromise and is as far as the Commission is willing to go." The agreement provided, in pertinent part, that:

> Judge Elliott will not return to the Portsmouth General District Court before August 25, 2005.  Before his suspension order will be rescinded, Judge Elliott must sign and deliver to his attorney, Mr. Marsh, an irrevocable letter to the Chief Justice announcing Judge Elliott's retirement effective not later than January 31, 2006, and Mr. Marsh must submit to the Commission his written representation that he will deliver Judge Elliott's letter to the Chief Justice not later than September 1, 2005.

(Emphasis in original.)

This document also included a provision that it "incorporates by reference the attached 'Acceptance of Conditions' signed by the judge and his counsel on June 17, 2005."  Counsel for the Commission further indicated that his "best chance to persuade the full Commission to accept the revised agreement . . . will be if I am able to present the matter to the members . . . in a posture where you and the judge already have signed the agreement."  Judge Elliott and his counsel signed this agreement on August 15, 2005 and returned it to the Commission.[6]

---

[6] The record contains a letter dated August 17, 2005 from counsel for Judge Elliott to counsel for the Commission stating that he had in his possession a letter from the judge to the Chief Justice stating that the judge would retire on April 30,

15

In a letter dated August 19, 2005, counsel for the Commission advised Judge Elliott's counsel that the matter would be considered by the Commission again at its next meeting on September 13, 2005. Following that meeting, counsel for the Commission sent a letter by telefacsimile to counsel for Judge Elliott advising him that the Commission had decided that a formal complaint would be filed in this Court unless Judge Elliott signed an agreement, which, in pertinent part, required the judge to "submit to the Chief Justice a letter announcing his retirement effective not later than December 31, 2005." Judge Elliott was advised that he was required to respond by 5 p.m. the following day. Judge Elliott did not sign the agreement as drafted by the Commission.

By an order dated September 20, 2005, the Commission made specific findings regarding Judge Elliott's conduct that had been the subject of the June 14-15, 2005 hearing. The Commission further found that Judge Elliott had not abided by the conditions set by the Commission for lifting the suspension order and permitting Judge Elliott to resume his judicial duties pending his retirement. Accordingly, the Commission directed

---

2006. Counsel for Judge Elliott maintains that his letter was hand-delivered to the Commission on August 17, 2005. The Commission maintains it has no record of the letter being received or filed.

16

counsel for the Commission to file a formal complaint in this Court. The complaint against Judge Elliott was filed in this Court on September 26, 2005, and gave as the basis of the complaint the seven charges found by the Commission at the conclusion of the June 14-15, 2005 hearing to have been proven by clear and convincing evidence and of sufficient gravity to warrant Judge Elliott's censure or removal from office.

DISCUSSION

The censure or removal of a judge from office for violations of the Canons of Judicial Conduct or other malfeasance is a matter of great significance to the judiciary as well as the general public. Public confidence in the judiciary and the administration of our legal system depends upon faithful adherence to the law and to the rules governing judicial conduct by those who are entrusted with the responsibility of sitting in judgment of others. However, the desire to instill public confidence in the courts by carefully policing the conduct of judges must be balanced against the rights of the judge who is called upon to answer charges of misbehavior or malfeasance in the exercise of his official duties.

The procedural due process requirements of the Constitution of Virginia compel the Commission, and this Court, to recognize the balance that must be struck between protecting the integrity

17

of the judiciary and the rights of individual judges.  To that end, the Commission must employ adequate procedural safeguards to prevent the arbitrary deprivation of the rights and property interests of a judge who stands accused of official misconduct.  See In re Ruffalo, 390 U.S. 544, 551-52 (1968).  This is so not merely because the removal of the judge deprives him of vested property rights, but also because the lesser penalty of censure imperils the judge's "good name, reputation, honor, or integrity."  Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971); see also Paul v. Davis, 424 U.S. 693, 730 (1976); Goss v. Lopez, 419 U.S. 565, 574-75 (1975); In re Deming, 736 P.2d 639, 648 (Wash. 1987).  Accordingly, public confidence in the judiciary and the administration of our legal system can be maintained only where the Commission in the exercise of its authority to oversee the conduct of judges is held to the same high standard of fair dealing every citizen has the right to expect from the government.

The Commission's authority derives from Article VI, Section 10 of the Constitution of Virginia, which provides that "[t]he General Assembly shall create a Judicial Inquiry and Review Commission consisting of members of the judiciary, the bar, and the public and vested with the power to investigate charges which would be the basis for retirement, censure, or removal of a judge."  Pursuant to that mandate, the General Assembly has

18

enacted legislation creating and empowering the Commission. Code §§ 17.1-900 to –919.  Among the powers delegated to the Commission by the General Assembly is "the authority to make rules, not in conflict with the provisions of this chapter or of general law, to govern investigations and hearings conducted by it."  Code § 17.1-902.

When an administrative body is delegated rulemaking authority by the General Assembly, it is given broad discretion to determine the procedures it will employ in carrying out its legislative mandate, so long as the rules it adopts are not inconsistent with the authority of the statutes that govern it or with principles of due process.  See, e.g., Sargent Elec. Co. v. Woodall, 228 Va. 419, 424, 323 S.E.2d 102, 105 (1984). "Furthermore, it is an elementary principle of administrative law that agencies must follow their properly promulgated rules." Virginia Committee for Fair Utility Rates v. Virginia Electric & Power Co., 243 Va. 320, 328, 414 S.E.2d 834, 838 (1992).  " 'For once an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate these rules.  If an agency in its proceedings violates its rules and prejudice results, any action taken as a result of the proceedings cannot stand.' "  Id. (quoting Scott v. Heckler, 768 F.2d 172, 178-79

19

(7th Cir. 1985)).  These principles are applicable to the Commission.

In responding to the complaint brought by the Commission against him in this Court, Judge Elliott contends that following the June 14-15, 2005 hearing the Commission entered into an agreement with him that foreclosed the filing of a formal complaint against him in this Court.  He further contends that the Commission thereafter failed to abide by the terms of that agreement and instead continued to modify the agreement unilaterally.  Contrary to the findings of the Commission following the August 9, 2005 hearing, Judge Elliott maintains that he has not violated any express terms of the agreement.

In response, the Commission maintains that there never was an enforceable JIRC Rule 15(A)(4) supervision agreement between the Commission and the judge, either following the June 14-15, 2005 hearing or at anytime thereafter.  Rather, the Commission characterizes the status of the case against Judge Elliott following that hearing as still pending, and further contends that the formation of a JIRC Rule 15(A)(4) supervision agreement was dependant upon Judge Elliott first satisfying the conditions laid down by the Commission at that hearing.  The Commission further maintains that, to the extent that there was an agreement of any kind, whether characterized as a JIRC Rule 15(A)(4) supervision agreement or as an agreement to conditions

20

that could result in a JIRC Rule 15(A)(4) supervision agreement, the judge's subsequent remarks to the two individuals who had testified at the evidentiary hearing on June 14-15, 2005 constituted a breach of that agreement. Thus, the Commission asserts that it was permitted to bring a complaint to this Court based upon the charges found by the Commission to have been proven by clear and convincing evidence.

The parties agreed during oral argument before this Court that the issues of whether there was an agreement between the parties, however it is ultimately characterized, and whether that agreement was breached are threshold questions to be resolved before this Court can review the evidence and reach its own findings and conclusions concerning the underlying complaint.[7] See Peatross, 269 Va. at 443, 611 S.E.2d at 400; Lewis, 264 Va. at 405, 568 S.E.2d at 689. Accordingly, it is

_____

[7] During oral argument, counsel for the Commission contended that this Court owed deference to the Commission's determinations that there was no JIRC Rule 15(A)(4) supervision agreement and that Judge Elliott had breached the conditions made by the Commission for reaching such an agreement. We disagree. When a complaint is brought to this Court by the Commission, "we do not give 'due weight' to the Commission's findings or their credibility determinations. Instead, we accord the Commission's findings only such weight, if any, as we deem appropriate in each case." Peatross, 269 Va. at 444, 611 S.E.2d at 400. This rule applies not only to the determination of the evidence supporting the charges brought by the Commission in its complaint, but also to whether the Commission followed proper procedure in bringing that complaint to this Court.

21

necessary for this Court to consider the provisions and application of JIRC Rule 15(A) in some detail.

JIRC Rule 15(A) delineates the manner in which the Commission may dispose of charges against a judge once its investigation has been concluded. Pursuant to this Rule, the Commission may take any of the following actions:

> 1. Remove the charges from the Commission's docket.
>
> 2. If the Commission finds the charges against the judge to be well founded and of sufficient gravity to constitute the basis for retirement, censure or removal, it shall file a complaint against the judge in the Supreme Court of Virginia.
>
> 3. If the Commission finds the charges against the judge to be well founded but not of sufficient gravity to constitute the basis for retirement, censure or removal, it may summon the judge before the Commission or designated Commission members, and advise the judge of its findings. The charges shall then be removed from [the] Commission's docket but may, nevertheless, be considered with any other future charges against the judge.
>
> 4. If the Commission finds the charges against the judge to be well founded, the Commission may, with the consent of the judge, place the judge on a period of supervision under such terms and conditions as the Commission shall determine. Violation of such terms and conditions shall be grounds for a new charge of failure to cooperate with the Commission.[8]

---

[8] While Rule 15(A)(4) does not require the agreement to be in writing, undoubtedly that practice is routinely followed to avoid any dispute over the terms and conditions of the agreement. Similarly, the Commission's requirement that a judge sign an "Acceptance of Conditions" prior to formalizing the Commission's terms for a period of supervision is not inconsistent with this rule.

22

Finally, Rule 15(A)(5) requires the Commission to report to the General Assembly any instance in which "the Commission finds the charges against [a] judge to be well founded under [JIRC Rule] 15A (2), (3), or (4)." See also Code § 17.1-918.

The structure of the rule is significant and entirely consistent with the goal of confidentiality embodied in Code § 17.1-913, while permitting the Commission to exercise a broad range of dispositional options in performing its legislative mandate in a fair manner in a particular case. The first option, 15(A)(1), permits the Commission to remove the charges from the Commission's docket. Such an action, indicating that the Commission did not find the charges to be well founded, would end the matter with no negative consequence to the judge. The second option, 15(A)(2), applies when the charges are determined to be well founded and serious enough to warrant retirement, censure or removal of a judge, and permits the Commission to file a complaint against the judge in this Court. Similarly, the third option, 15(A)(3), permits the Commission to remove from its docket charges that it determines are well founded, but not by themselves serious enough to warrant disciplinary action, with the possibility that, in the event of future misconduct, consideration of the charges may be revived.

23

Such a disposition provides a warning to a judge and the opportunity to avoid future misconduct.

The fourth option, 15(A)(4), permits the Commission, when it finds the charges to be well founded and with the consent of the judge, to place the judge on a period of supervision under such terms and conditions as the Commission shall determine. This option affords the judge the benefit of a period of supervision to avoid future misconduct and also to avoid some of the consequences of his past misconduct, including censure or removal. Rule 15(A)(4) specifically provides that a violation of the terms and conditions of the agreement "shall be grounds for a <u>new charge</u> of failure to cooperate with the Commission" (emphasis added); thus providing the basis for the Commission to enforce the agreement.

The Commission's authority to enter into an agreement with a judge pursuant to Rule 15(A)(4) even though the Commission has found the charges to be "well founded" under Rule 15(A)(2) is not contested in this case. Nevertheless, we note that Rule 15(A)(2) provides that the Commission "shall" file a complaint in this Court when the Commission finds the charges against a judge to be well founded and of sufficient gravity to constitute a basis for retirement, censure, or removal. This rule must be interpreted and applied so as to be consistent with the

24

pertinent constitutional and statutory provisions pertaining to the authority of the Commission.

Article VI, Section 10 of the Constitution of Virginia provides that "[i]f the Commission finds the charges [against a judge] to be well-founded, it may file a formal complaint before the Supreme Court." (Emphasis added.) Similarly, Code § 17.1-902 provides that "[i]f the Commission finds the charges to be well-founded, and sufficient to constitute the basis for retirement, censure, or removal of a judge, it may file a formal complaint before the Supreme Court." (Emphasis added.) Guided by these clear provisions, we are of opinion that the provisions of Rule 15(A)(2) are necessarily permissive, rather than mandatory. This interpretation of Rule 15(A)(2) brings it within the constitutional and statutory provisions pertaining to the Commission's authority and removes any potential conflict in the application of Rule 15(A)(2) and Rule 15(A)(4). Beyond question, this interpretation affords the judge a considerable benefit, and is entirely consistent with principles of fair procedure. Accordingly, the Commission may enter into a Rule 15(A)(4) agreement when it has found that the charges are well founded and of sufficient gravity to constitute a basis for retirement, censure or removal, but determines that such an agreement is appropriate under the circumstances of a particular case.

25

We take particular care to emphasize that the proceedings before the Commission are not criminal in nature, and that the agreement contemplated by Rule 15(A)(4) does not, and need not, readily lend itself to a definitive characterization. However, for purposes of our analysis in this case, the agreement may be likened to a form of immunity agreement offered by the Commonwealth to a citizen who is a potential defendant in a criminal investigation. When the Commonwealth offers a citizen immunity from prosecution in exchange for his cooperation and the citizen abides by the terms of the agreement, "due process requires that the government provide him with the benefit of his bargain." Lampkins v. Commonwealth, 44 Va. App. 709, 722, 607 S.E.2d 722, 729 (2005). Once such an agreement is entered into, the government bears the burden of establishing that the citizen has breached the agreement and is subject to prosecution. Id. In this context, we are of opinion that an agreement reached between the Commission and a judge would be essentially meaningless and futile unless the judge, upon compliance with the terms and conditions of the agreement, is afforded the benefit of his bargain. Clearly the most significant benefit would be a bar against the filing of a complaint against the judge in this Court pursuant to Rule 15(A)(2).

In order to determine whether there was an "agreement" between the Commission and Judge Elliott in this case, we will

26

apply the basic law of contracts.  See Hood v. Commonwealth, 269 Va. 176, 181, 608 S.E.2d 913, 915-16 (2005)(noting that cooperation/immunity agreements are "generally governed by the law of contracts").  The most basic principle of contract law is that when one party makes an offer that is clear, definite, and explicit, and leaves nothing open for negotiation, acceptance of that offer by the other party will complete the contract.  See Chang v. First Colonial Sav. Bank, 242 Va. 388, 391, 410 S.E.2d 928, 930 (1991).

At the conclusion of the June 14-15, 2005 hearing, the Commission, speaking through its Chairman, expressly stated that, despite finding that the charges before it were well founded and of sufficient gravity to warrant the filing of a complaint in this Court, "pursuant to the provisions of [JIRC] Rule 15(A)(4), the Commission will offer you the conditions that may forego the forwarding of those charges to the Supreme Court."  The Chairman then recited the clear, definite, and explicit terms of that offer.  The offer was conditioned upon Judge Elliott's providing the Commission with his "signed acceptance of these terms . . . not later than 12 o'clock Friday June 17th [2005]."  Judge Elliott signed the "Acceptance of Conditions" document provided to him by the Commission which unambiguously served as his acceptance of "the conditions

specified by the Judicial Inquiry and Review Commission in . . . the Commission proceeding on June 15, 2005."

The Commission contends, however, that Judge Elliott's acceptance of the terms and conditions set forth by the Chairman at the conclusion of the June 14-15, 2005 hearing did not result in the formation of a JIRC Rule 15(A)(4) supervision agreement, but only required the Commission to offer such an agreement at a future date if Judge Elliott complied with those terms and conditions. In support of this contention, the Commission notes that it never rescinded the August 26, 2004 order suspending Judge Elliott and, thus, there could not have been a JIRC Rule 15(A)(4) supervision agreement.

We are not inclined to place form over substance. The Chairman's offer at the conclusion of the June 14-15, 2005 hearing was unequivocal that Judge Elliott would be permitted to return to the bench if he accepted the terms and conditions outlined at the hearing. Judge Elliott accepted that offer and began the process of complying with what he would reasonably believe was an agreement with the Commission to avoid the filing of formal charges in this Court. Indeed, the Commission assisted the judge in that regard by providing draft letters of apology it had required the judge to send under one of the terms of the agreement.

The subsequent statements by counsel for the Commission in communications with Judge Elliott's counsel that the draft written agreement the judge would "eventually" be required to sign had not yet been approved by the Commission and that counsel for the Commission would not "sign the agreement on behalf of the Commission" until the Chairman or Commission members had approved the document, reflect concerns of form rather than substance. As we have noted, nothing in the Commission's rules requires that a JIRC Rule 15(A)(4) supervision agreement be in writing. Moreover, nothing in the Chairman's recitation of the Commission's offer to the judge at the conclusion of the June 14-15, 2005 hearing reasonably could have been understood to mean that the Commission was merely establishing predicates for some future agreement that would differ from the terms of the Commission's offer.

While the Chairman did indicate that "these terms will be reduced to writing immediately," he also indicated that Judge Elliott could inform others that he would be returning to the bench immediately "after the hearing here," suggesting that the requirements for a written recitation of the terms and a written acknowledgement of those terms were formalities or conditions subsequent. When parties execute an agreement, either oral or written, they will frequently contemplate that a future writing will be executed as part of their obligations under the

29

agreement. Such contemplation, however, does not necessarily render the agreement invalid or unenforceable, even if the contemplated writing is not immediately executed. Cf. Golding v. Floyd, 261 Va. 190, 193-194, 539 S.E.2d 735, 737 (2001); Snyder-Falkinham v. Stockburger, 249 Va. 376, 385, 457 S.E.2d 36, 41 (1995); North America Mgrs., Inc. v. Reinach, 177 Va. 116, 121, 12 S.E.2d 806, 808 (1941); Manss-Owens Co. v. H.S. Owens & Son, 129 Va. 183, 195, 105 S.E. 543, 547 (1921). Moreover, the terms imposed by the Commission were "reduced to writing" in the form of the hearing transcript excerpt sent to Judge Elliott's counsel along with the "Acceptance of Conditions," which referenced the transcript as the source of the offer Judge Elliott was being asked to, and actually did, accept. The substance of the agreement, regardless of its form, was clear.

Nor are we persuaded that the Commission's not having entered an order rescinding Judge Elliott's suspension supports the conclusion that it did not intend to enter into a JIRC Rule 15(A)(4) supervision agreement with the judge. To the contrary, the conditions as set forth by the Commission and accepted by Judge Elliott required him "to take annual leave until the Commission determines that [he has] satisfied the Commission's conditions for [his] return to the bench." If the Commission had intended for Judge Elliott to remain under suspension, it

would not, indeed could not, have required him to absent himself from the bench by taking annual leave. Code § 17.1-911(A). The fact that the Commission did not comply with its own decision to lift the suspension and permit Judge Elliott to complete the other conditions of the JIRC Rule 15(A)(4) supervision agreement while taking annual leave does not vitiate the fact that the Commission made such an offer and Judge Elliott accepted it.

For these reasons, we hold that the Commission made a clear, definite, and explicit offer to Judge Elliott to permit him to return to the bench under a JIRC Rule 15(A)(4) supervision agreement and that upon his acceptance of that offer the supervision agreement became effective and Judge Elliott was entitled to the benefit of that agreement, unless he subsequently violated its terms and conditions. Having determined that there was a valid JIRC Rule 15(A)(4) agreement between the parties which would otherwise foreclose the filing of a complaint against Judge Elliott in this Court, we now consider whether the record supports the Commission's subsequent finding that Judge Elliott breached that agreement.

The Commission asserts that Judge Elliott breached the agreement by communicating to others the fact that he would be returning to the bench. The Commission contends that the Chairman's statements that Judge Elliott "may announce that you have been returned to the bench" and "you may announce, after

31

the hearing here, that the determination of the Commission was such that you have been returned to the bench" are "isolated statement[s]." In the Commission's view, the full context of the conditions set forth by the Commission at the conclusion of the June 14-15, 2005 hearing was that the judge was to make no statement of any kind concerning the outcome of the proceeding until he had actually resumed his duties. The Commission further contends that "even if the Chairman's statements are regarded as ambiguous, any ambiguity was removed by Commission's Counsel's explicit written communication to the judge's counsel on June 17, 2005, before the judge signed the 'acceptance of conditions.' " (Emphasis in original.) We disagree.

First, the Chairman's statements were neither isolated nor ambiguous. To the contrary, the Chairman's original recitation of the condition and his reiteration of it at the conclusion of the hearing made it abundantly clear that immediately following the hearing Judge Elliott was free to advise others that he would be returning to the bench. Nothing in the transcript of the proceedings suggests that the Commission intended to put an absolute "gag order" on the judge or his counsel. Moreover, permitting Judge Elliott to reveal that he would be returning to the bench, but not to assert that he had been fully vindicated, is a condition entirely consistent with the Commission's

decision to enter into a JIRC Rule 15(A)(4) supervision agreement to permit the judge to return to his duties.

Nor are we persuaded that the statement made by counsel for the Commission in the June 17, 2005 telefacsimile was sufficient to alter the terms the Commission had established. The day before that communication, counsel for the Commission had provided the first draft of the Commission's written agreement, the second provision of which was an almost verbatim restatement of the Chairman's oral explanation of what the judge was prohibited from saying. Indeed, even in the final draft of this document, submitted to the judge after the August 9, 2005 hearing in which it was stated that the Commission was requiring the judge to make no statements concerning the resolution of his case, the condition remained only that the judge could not assert that he had been "exonerated or vindicated" by the Commission.

Reviewing the evidence received by the Commission at the August 9, 2005 hearing, we conclude that Judge Elliott did not breach the condition of the JIRC Rule 15(A)(4) supervision agreement that he not claim exoneration or vindication by the Commission. The evidence at best showed that in response to unsolicited inquiries from interested parties, the judge responded with innocuous pleasantries to the effect that he was "okay" and that "everything would be all right." Given the

33

context of these conversations, such communications were insufficient to establish, expressly or by implication, that Judge Elliott would be returning to the bench and/or that he was exonerated or vindicated by the Commission.

For these reasons, we hold that the record fails to support the Commission's finding that Judge Elliott breached the JIRC Rule 15(A)(4) agreement. In the absence of such a breach, the Commission remains bound by its agreement and, consequently, was foreclosed from revoking the agreement and filing a JIRC Rule 15(A)(2) complaint in this Court.

## CONCLUSION

Accordingly, we hold that the complaint is not properly before this Court and, therefore, must be dismissed without prejudice. We emphasize that our holding pertains only to whether the Commission's filing of the complaint was in accord with the procedures set out in its rules. We do not address and express no opinion on whether the charges against Judge Elliott enumerated in that complaint are supported by the record and, if so, what sanction would be appropriate. Nonetheless, we recognize that these charges, particularly those pertaining to the improper consultation of defendants' criminal records and the use of the "DEA light" fiction, are of grave concern as they touch upon matters at the very heart of public confidence in the judiciary and the judicial system.

34

By dismissing the complaint without prejudice, we fully expect that the Commission and Judge Elliott will abide by the original terms of their agreement, modified as necessary to account for the passage of time required to bring the matter before this Court. Should the judge fail to do so, the Commission will be empowered by JIRC Rule 15(A)(4) to bring "a new charge of failure to cooperate with the Commission" in this Court.[9]

Dismissed.

JUSTICE KEENAN, with whom JUSTICE LACY and SENIOR JUSTICE COMPTON join, dissenting.

I respectfully dissent. I would hold that the Commission's own Rules, and the Constitution and statutes of Virginia, precluded the Commission from entering into an agreement with Judge Elliott. Under the Commission's rules, having found that the charges against Judge Elliott were of sufficient gravity and were well-founded, the Commission did not have authority to dispose of those charges by placing him under the Commission's supervision. Moreover, neither the Constitution of Virginia nor the Code of Virginia authorizes the Commission to enter into

---

[9] Because we have concluded that the complaint against Judge Elliott is not properly before this Court, we will not consider Judge Elliott's arguments that his suspension violated his due process rights and that the charges relating to his communications with the other judges, his clerk staff, and

supervisory agreements following an investigation into the conduct of a judge. Therefore, I would conclude that the purported agreement the Commission reached with Judge Elliott was a nullity, that the present complaint is properly before this Court, and that we are required to decide whether Judge Elliott must be censured or removed from office.

The majority's analysis rests on its determination that Judge Elliott had a due process right to retain the benefit of his purported agreement with the Commission. The ability to invoke a due process right, however, presupposes the existence of an enforceable right. Here, Judge Elliott's alleged right to have his bargain with the Commission enforced incorrectly assumes that the Commission had the authority to enter into a bargain in the first place.

As the majority notes, Rule 15(A) of the Rules of the Judicial Inquiry and Review Commission (Rule 15(A)) describes the manner in which the Commission must proceed against a judge once it has concluded its investigation into the judge's alleged misconduct. Under Rule 15(A)(2):

> If the Commission finds the charges against the judge to be well founded and of sufficient gravity to constitute the basis for retirement, censure or removal, it shall file a complaint against the judge in the Supreme Court of Virginia.

others are an unconstitutional infringement on his right of freedom of speech.

36

(Emphasis added).

A plain reading of this provision indicates that when, as here, the Commission has found that the gravity of the charges is sufficient to warrant retirement, censure, or removal of a judge, the Commission "shall" file a complaint in this Court. These provisions of Rule 15(A)(2) are mandatory, not discretionary. I would hold that the majority's contrary construction is flawed because it effectively renders the use of "shall" meaningless.

I would further hold that the Commission did not have authority to enter into a supervision agreement under Rule 15(A)(4) because the Commission has not been granted such authority by the Constitution or Code of Virginia. The Constitution vests the Commission "with the power to investigate charges which would be the basis for retirement, censure, or removal of a judge." Va. Const. art. VI, § 10. After the Commission has conducted such an investigation, the Constitution prescribes a single course of action that the Commission may take once it has determined that the charges are well-founded: "[The Commission] may file a formal complaint before the Supreme Court." Id. This constitutional directive is repeated in Code § 17.1-902:

> The Commission is vested with the power, and it shall be its duty, to investigate charges arising out of the

37

present or any prior term of office which would be the basis for retirement, censure, or removal of a judge under Article VI, Section 10 of the Constitution of Virginia and the provisions of this chapter. . . . If the Commission finds the charges to be well-founded, and sufficient to constitute the basis for retirement, censure, or removal of a judge, <u>it may file a formal complaint before the Supreme Court</u>.

(Emphasis added.)

The above constitutional and statutory provisions do not authorize the Commission to enter into supervisory agreements when the charges are determined to be well-founded, irrespective whether the charges are of such gravity to support censure, retirement, or removal of a judge, or are of lesser gravity.[10]

While the Commission is given authority to promulgate procedural rules, that authority is limited by statute to rules relating to the procedure for investigations and hearings conducted by the Commission. Code § 17.1-902 provides:

The Commission shall have the authority to make rules, not in conflict with the provisions of this chapter or of general law, <u>to govern investigations and hearings conducted by it</u>.

(Emphasis added.) This statute does not provide the Commission authority to promulgate rules that effectively expand its statutory authority.

---

[*] The single exception in which such authority is suggested is where a judge is considered to be unfit to serve because of disability. Code § 17.1-918 refers to "remedial" action taken in reports to the General Assembly.

The Commission is not an occupational regulatory board. Those boards, such as the Board of Dentistry, the Board of Medicine, the Board of Nursing, the Board of Pharmacy, the Board of Accountancy, and the State Bar Disciplinary Board, are given specific authority to regulate the activities of the members of their respective professions. By statute or Rule of this Court, those entities are vested with specific authority not only to investigate charges of misfeasance, but to dispose of those charges by imposing license suspension, probation with or without terms, reprimands, and in some cases financial penalties. See, e.g., Code §§ 54.1-2706, -2915, -3007, -3316, -4413; Va. Sup. Ct. R. part 6, § IV, para. 13(B)(5)(b). None of those disposition options is given to the Commission in its enabling legislation. Thus, the Commission lacks the authority to act as an occupational regulatory board and enter into the type of supervisory agreements described in Rule 15(A)(4).

The majority fails to discuss the fact that the General Assembly did not choose to grant the Commission similar, explicit supervisory authority. Instead, the majority relies on the absence of the word "shall" in the Constitution and the Code, and opines that because the Commission is permitted, but is not required, to seek the censure or removal of a judge before this Court, the Commission may take other actions of its own choosing. This interpretation departs from established

39

principles of statutory construction because it creates authority from the absence of authority.

The fact that the Commission has authority under the Constitution and the Code to refrain from proceeding against a judge when the charges are well-founded and of sufficient gravity does not mean that the Commission is authorized to dispose of those charges by entering into a supervisory agreement with that judge. Such powers cannot derive from the absence of authority. Yet that is precisely what the majority's analysis attempts to effectuate.

Extended to its logical conclusion, under the majority's analysis, there would be innumerable powers that the Commission may have simply because those powers are not mentioned in either the Constitution or the Code. Such powers would include the imposition of public reprimands, fines, and other sanctions of the Commission's choosing. I cannot conclude that the General Assembly intended such a result. Therefore, I would hold that while the Commission was authorized by statute to refrain from proceeding against Judge Elliott, the Commission was not authorized to enter into a supervisory agreement with him.

Because the Commission lacked authority to enter into a supervisory agreement, Judge Elliott cannot rely on the Commission's alleged breach of such an agreement. Accordingly, I would conclude that this Court must examine the record to

40

determine whether the charges against Judge Elliott are supported by clear and convincing evidence. See Judicial Inquiry & Review Commission v. Peatross, 269 Va. 428, 444, 611 S.E.2d 392, 400 (2005); Judicial Inquiry & Review Commission v. Lewis, 264 Va. 401, 405, 568 S.E.2d 687, 689 (2002).

Although the record before us contains evidence concerning the seven separate charges made against Judge Elliott, I confine my review to the fifth enumerated charge involving Judge Elliott's false statements to criminal defendants about the existence of a "DEA light" in the courtroom. I would conclude that this evidence, which is uncontested in its substance, is overwhelming and mandates the sanctioning of Judge Elliott.

The evidence established that Judge Elliott regularly told persons accused of crimes that the "DEA" had installed a light in his courtroom that would indicate whether a person was using illegal drugs. There was, of course, no such light installed.

According to the evidence, Judge Elliott ordered certain criminal defendants to "look up at the light," and then informed them that they had the option of submitting to a drug test in order to have the opportunity to receive a more lenient sentence. In cases in which a defendant elected to take a drug test and passed it, Judge Elliott often suspended the defendant's jail sentence. In cases, however, in which a

41

defendant failed the offered drug test, he would receive the full sentence originally imposed by Judge Elliott. In addition, Judge Elliott allowed certain defendants who refused a drug test to admit that they were currently using drugs in exchange for receiving a partially suspended sentence.

The evidence also included testimony from several courtroom clerks, each of whom testified that Judge Elliott referred to the "DEA light" on a frequent basis. Two of these witnesses testified that when they were assigned to Judge Elliott's courtroom, he mentioned the "DEA light" at least once per day.

During his testimony before the Commission, Judge Elliott admitted that the allegations about his reference to a "DEA light" were true but contended that he only made false statements of this nature over a six-month period. Judge Elliott also testified that at the time he made statements from the bench concerning the "DEA light," he "didn't see nothing wrong" with his actions. He later qualified that statement, testifying, "I knew it wasn't right, but I didn't think it was that wrong wrong [sic]." Judge Elliott then attempted to justify his actions, stating, "I think all judges have some things like that they might do every now and then."

Based on this record, I would conclude that the evidence is clear and convincing that Judge Elliott routinely lied from the bench to criminal defendants over a substantial period of time.

42

His conduct deceived some of those defendants into making self-incriminatory statements, thus depriving them of rights guaranteed by the United States Constitution and the Constitution of Virginia.

Such conduct on the part of a judge undermines the very foundation of our judicial system. At a minimum, persons appearing before a judge in this Commonwealth have a right to expect that the judge will not lie to them or trick them into surrendering their constitutional rights. In my view, this Court must act to ensure that our citizens can trust a judge's representations on any matter related to the trial of a case in our Commonwealth's courts. Judge Elliott's repeated dishonesty and disregard of citizens' constitutional rights cannot be reconciled with our system of justice and with the need for public confidence in our courts. Accordingly, I would hold that Judge Elliott's actions necessitate his removal from office.

Finally, I express my concern that the Court's holding today has far-reaching consequences beyond the present case. That holding effectively provides the Commission unregulated authority to determine the contents of future supervisory agreements, because neither the Constitution nor the Code give this Court appellate jurisdiction to review such agreements. Because our jurisdiction in cases involving the Commission is purely original rather than appellate, a fact the majority does

43

not contest, we are precluded from granting a judge an appeal to review the Commission's actions in negotiating, defining, and monitoring the terms of a supervisory agreement.  Thus, although the majority opines that its interpretation today will afford judges "a considerable benefit [and] is entirely consistent with principles of fair procedure," this Court may be powerless to act if the majority's assumption is proved incorrect.