PRESENT:  Hassell, C.J., Keenan, Koontz, Lemons, and Agee, JJ., and Carrico and Stephenson, S.JJ.

JUDICIAL INQUIRY AND REVIEW
COMMISSION OF VIRGINIA

v.   Record No. 071014                          OPINION BY
                                     JUSTICE BARBARA MILANO KEENAN
                                            November 2, 2007

JAMES MICHAEL SHULL, JUDGE OF
THE THIRTIETH JUDICIAL DISTRICT


The Judicial Inquiry and Review Commission (the Commission) filed the present complaint against James Michael Shull, Judge of the Thirtieth Judicial District, pursuant to the original jurisdiction of this Court set forth in Article VI, § 10 of the Constitution of Virginia and Code § 17.1-902. The Commission alleged that its charges against Judge Shull for allegedly violating the Canons of Judicial Conduct (the Canons) are well founded in fact, and that the violations are of sufficient gravity to require that this Court censure or remove him from office.

## I. FACTS AND PROCEEDINGS

On December 20, 2006, the Commission issued an order pursuant to Code § 17.1-911(A) and (C), suspending Judge Shull from the exercise of his judicial powers. The suspension initially arose from two incidents that occurred at a custody and visitation hearing over which Judge Shull presided in the

1

Wise County Juvenile and Domestic Relations District Court (the juvenile and domestic relations court).

After receiving the order of suspension, Judge Shull requested that the Commission conduct a hearing allowed by Code § 17.1-911(B) to review whether "justice would be served" by continuing his suspension from office pending resolution of the charges.[1]  See id.  Judge Shull asserted that due process required that the Commission present evidence supporting its decision to suspend him, and maintained that the Commission should bear the burden of proving that "justice would be served" by continuing his suspension.  Judge Shull further asserted that he should be permitted at the hearing to cross-examine any witnesses who had provided evidence supporting the Commission's decision temporarily suspending him from office.[2]

On January 9, 2007, the Commission conducted the requested hearing (the suspension hearing), at which the Commission entered into evidence a two-page written summary stating the Commission's factual basis for temporarily suspending Judge Shull (the statement of facts).  In the statement of facts, the

---

[1] Code § 17.1-911(B) states that "[t]he Commission shall give the judge reasonable notice of such suspension as prescribed by the rules of the Commission and, if requested by the judge or his attorney, shall schedule a hearing during the first fifteen days of the suspension in order to determine whether justice would be served for the suspension to continue until the completion of the investigation or formal hearing."

[2] The Commission did not issue formal charges against Judge Shull at the time it suspended him.

Commission alleged that in December 2006, Tammy L. H. Giza (Giza) obtained a temporary protective order against her husband, Joseph A. K. Giza (Keith Giza), based on her allegation that he had assaulted her. The Commission alleged that on December 12, 2006, in a hearing in the juvenile and domestic relations court, Judge Elizabeth S. Wills granted Giza's request for a continuance, extended the protective order for a three-day period until December 15, 2006, and directed Giza to notify the juvenile and domestic relations court when she retained counsel. The Commission further alleged that during a hearing in the juvenile and domestic relations court on December 15, 2006, in which Judge Shull presided, Giza sought to extend the protective order against her husband and to secure custody of her two children (the Giza custody hearing). Judge Shull denied Giza's request for a continuance to obtain counsel.

According to the Commission, during the Giza custody hearing, Giza claimed that Keith Giza had inflicted a wound on her thigh. Keith Giza disputed the nature and existence of the wound. The Commission alleged that when Giza told Judge Shull she could not exhibit the wound without lowering her pants, Judge Shull indicated that he would not extend the protective order without first viewing the wound. The Commission alleged that Judge Shull twice directed Giza to lower her pants in the courtroom so that he could inspect the wound. The Commission

3

further alleged that during a recess in the Giza custody hearing, Judge Shull initiated an ex parte telephone call to a hospital where Giza stated she had been treated for the wound.

At the suspension hearing, Judge Shull presented two witnesses who testified about the events that took place at the Giza custody hearing. Those witnesses were Daniel W. Fast, who represented Keith Giza at the Giza custody hearing, and Amy Johnson, a probation officer who also was present at the Giza custody hearing.

Fast and Johnson both testified that Giza offered to show her wounds to Judge Shull before he first directed her to do so. Fast also stated that before viewing the wound on the second occasion, Judge Shull "told [Giza] he wanted to see the stitch wounds," left his seat on the bench, and directed Giza to lower her pants. At the conclusion of the suspension hearing, the Commission determined that justice would be served by continuing Judge Shull's suspension.

On February 9, 2007, the Commission issued three formal charges against Judge Shull for alleged violations of Canons 1, 2, 2(A), 3(B)(2), 3(B)(3), 3(B)(4), and 3(B)(7). The Commission alleged that Judge Shull initiated an improper ex parte telephone call during a recess in the Giza custody hearing and treated Giza in an undignified, discourteous, and uncivil manner when he twice directed her to lower her pants in the courtroom.

4

In addition, the Commission alleged that during a different hearing involving visitation over which Judge Shull presided, when the two parents could not agree upon which parent would receive the preferred share of a divided holiday visitation period, Judge Shull directed that the issue would be determined by the toss of a coin, and twice tossed a coin in the courtroom while court was in session to resolve the dispute.

Judge Shull responded to the charges by asserting that he had not violated the Canons. While Judge Shull admitted that he had determined a contested legal matter by twice flipping a coin during a courtroom proceeding, he argued that his action was intended to encourage the litigants to resolve the custody issues by themselves and to "demonstrate . . . that his award of custody . . . would be as random as a coin toss." Judge Shull also maintained that neither parent had objected to resolving the custody dispute by a coin toss.

Judge Shull admitted in his response to the Commission that during the Giza custody hearing, Giza twice lowered her pants in the courtroom to allow him to inspect her thigh wound, but asserted that Giza volunteered to lower her pants and that he merely permitted her to do so. According to Judge Shull, he directed the bailiff to close "privacy curtains" before allowing Giza to lower her pants, and the only people present in the courtroom who could see Giza exposed were officially involved in

5

the Giza proceedings.  Judge Shull admitted that he could have "handled" the Giza custody hearing "in a more sensitive manner," but maintained that his conduct was not a violation of the Canons.

Judge Shull admitted that he initiated an ex parte telephone call to the hospital where Giza alleged she was treated, but asserted that before he placed the call, he informed everyone in the courtroom that he planned to do so. Judge Shull maintained that "it is not uncommon" for judges in the juvenile and domestic relations court to place telephone calls to ascertain the truth when resolving a factual dispute.

On April 10 and 11, 2007, the Commission conducted an evidentiary hearing (the April hearing) on the charges.  At the April hearing, Judge Shull conceded that he had tossed a coin to decide a visitation issue, and that this action was "wrong." Judge Shull also admitted that the ex parte telephone call he made during the Giza custody hearing was a violation of Canon 3(B)(7).  Judge Shull further stipulated at the April hearing that he "admitted to violations" of "Canons 2 and 3."

Most of the essential facts concerning the Giza custody hearing were undisputed at the April hearing.  Judge Shull testified that he denied Giza's request for a continuance to obtain counsel because she had failed to keep an earlier appointment with an attorney she wished to retain, and Judge

6

Shull was concerned about continuing the case further given the nature of the proceedings.

Judge Shull admitted that Giza twice lowered her pants in the courtroom during the Giza custody hearing, and that he "initiated" both incidents. Judge Shull also conceded that at the time Giza lowered her pants, he was aware that Giza had a history of mental illness.

Judge Shull testified that during the Giza custody hearing, he learned that Giza had been committed to the Southwestern Virginia Mental Health Institute at Marion (the Marion mental health facility) in March 2006. Judge Shull stated that before he conducted his viewings of Giza's thigh wound, he had reviewed a March 2006 police report stating that Giza had admitted engaging in self-mutilation "to get attention." Judge Shull further conceded that "there had been some statements to the effect that maybe [Giza] was a person of diminished capacity," but maintained that he observed "no apparent diminished capacity" at the time of the Giza custody hearing.

Several other witnesses at the April hearing testified regarding additional information provided to Judge Shull at the Giza custody hearing concerning Giza's mental condition. According to Giza, Daniel Fast informed Judge Shull at the "very first part of the hearing" that Giza had been committed to a mental health facility. Teresa Castle, the clerk present in the

7

courtroom at the Giza custody hearing, testified that Fast argued "right off the bat" that Giza had engaged in self-mutilation on an earlier occasion.

Edward Gardner, the bailiff in the courtroom during the Giza custody hearing, stated that before Judge Shull viewed the wound on Giza's thigh, Giza admitted that she had previously cut herself and that she had later sought "help." Nicky Fleenor, a court-appointed Special Advocate for Wise County, testified that Giza informed Judge Shull of Giza's commitment to a mental health facility in March 2006. Finally, Keith Giza testified that the police report introduced into evidence and considered by Judge Shull indicated that Giza was committed to the Marion mental health facility as a result of her self-mutilation.

It was undisputed that Giza initially offered to show her wound by raising the leg of her pants but was unable to expose her wound in this manner. According to Judge Shull, Giza began to unbutton her pants although he did not direct her to do so. Keith Giza testified that when Giza could not raise the leg of her pants enough to reveal her wound, she nonetheless offered to show her injury. Castle testified that when Giza could not raise her pants leg sufficiently to reveal the wound, Giza said that she would have to "pull [her] britches down" to show the wound.

Castle and two other witnesses, Edward Gardner and Jewell Morgan, the guardian ad litem for the Giza children, all testified that after it became apparent that Giza could not reveal the wound by raising her pants leg, Judge Shull told Giza she would have to show the wound. Castle testified that, in response, Giza asked, "[Y]ou want me to pull my britches down in here?" Gardner testified that Giza said, "[M]ust I pull my pants down here in the courtroom?"

According to Castle, Judge Shull replied that if Giza wanted the protective order to remain in place, she would have to show her wound. Judge Shull testified that he believed it was necessary to view the wound because he was "faced with a prospect of sending the children either to a cutter or a stabber."

The testimony differed concerning the amount of time that Giza's pants remained lowered during the first viewing. The witnesses reported variously that the incident lasted for periods of time between a few seconds and five minutes. The testimony also was conflicting concerning how far Giza lowered her pants and how much of her anatomy was exposed at the time of the first viewing. Judge Shull and Keith Giza testified that Giza held the left side of her pants next to her body and pulled the right side down to expose her wound, but that she never lowered her pants. Judge Shull further stated that he did not

9

observe any of Giza's anatomy other than the part of her thigh where her wound was located, and that he did not see Giza's undergarments.

Several other witnesses, however, testified that Giza lowered her pants to her knees after Judge Shull directed her to show her wound. These witnesses included Fleenor, Castle, Gardner, and Morgan. Giza further stated that she was rendered "in shock" over Judge Shull's request that she lower her pants, and that she "didn't think that a court could order anybody to remove clothing."

Fleenor testified that she observed Giza's "back side" and her buttocks. Morgan stated that she saw Giza's "[c]heeks." Gardner testified that he was standing behind Giza when she lowered her pants, and that he saw Giza's "rear end part" and her buttocks. Castle testified that she did not see Giza from the rear, but saw the "front of her and up to her thigh." When Giza lowered her pants in the courtroom, Fleenor, Gardner, and Morgan each observed that Giza was wearing black or dark-colored "thong" or "g-string" underwear.

It was undisputed at the April hearing that Judge Shull "initiated" a second viewing of Giza's wound during the Giza custody hearing. Judge Shull testified that he stated to those present in the courtroom that it might be possible for him to determine if Giza had received stitches, because his "father had

10

been a surgeon." According to the witnesses who testified at the April hearing, Judge Shull left his seat on the bench, sat in the witness' chair, and directed Giza to stand about an "arm's length" from him and lower her pants a second time.

Giza stated that the second viewing lasted "a little bit longer" than the first. Other witnesses reported that the second viewing lasted for periods of time between a few seconds and "less than a minute."

Judge Shull testified that during the second viewing, Giza held "one side of her pant leg up at the hem and let[] it . . . drop, just to her knee," and that he did not see Giza's undergarments. Keith Giza testified that the second time Judge Shull asked to see Giza's wound, Giza "pulled down the right side of her pants to the wound and kept everything else guarded." However, according to Fleenor, Giza lowered her pants to her knees during the second viewing. Giza testified that when she lowered her pants, her buttocks were exposed to everyone who was behind her in the courtroom. Gardner testified that when Giza lowered her pants a second time, he "turned again and looked at the curtain" because he "didn't want to see again." Morgan testified that she turned her back to Giza and Judge Shull during the second viewing because "[i]t [was] kind of embarrassing."

Judge Shull further stated that after the second viewing, he concluded that Giza, in fact, had received stitches. Judge Shull testified that at the hearing he "felt less in control than [usual]," and admitted that he "probably . . . lost sensitivity to the overall situation" and "handled it poorly" and "indecorous[ly]," and "wrong." Castle testified that during the proceeding, Giza "looked upset." Fleenor, Morgan, Castle, and Keith Giza testified that Giza cried at the end of the Giza custody hearing.

Gardner testified that when he encountered Judge Shull outside the courtroom after the Giza custody hearing, Gardner asked Judge Shull, "[D]id you see what that lady had on[?]" According to Gardner, Judge Shull replied, "[Y]eah, a black lacy thong . . . it looked good, didn't it[?]" Judge Shull denied that he made any comments to Gardner concerning Giza's undergarments. Judge Shull testified that he only said to Gardner, "[T]hat was a rough case, wasn't it?" Judge Shull further testified that Gardner replied, "I think she came prepared to do what she did."

At the April hearing, Judge Shull admitted that he had appeared before the Commission in 2004 (the 2004 hearing). The Commission placed in evidence a letter the Commission sent to Judge Shull in 2004 explaining certain concerns the Commission had regarding Judge Shull's alleged conduct, and a transcript

12

from the 2004 hearing.  The letter made several allegations involving Judge Shull's courtroom conduct, including that he had repeatedly referred to a 14-year-old boy as a "mama's boy," a "wuss" and a "pussy," and stated that he understood why other boys would pick on the boy.  The letter also alleged that Judge Shull had told a female litigant who likely had been abused by her boyfriend that the litigant "should marry the boyfriend and that would put an end to the abuse."

In the 2004 hearing, Judge Shull admitted making some of the alleged statements but denied that he had told the 14-year old boy that he was a "pussy."  When asked, however, whether he had told the female litigant that she should marry the person whom she said had inflicted the bruises on her, Judge Shull stated, "Probably . . . I probably did say something to the effect, well, if you married this guy, it would remove an impediment [regarding custody of your children]."  At the conclusion of the 2004 hearing, Judge Shull stated, "Well, I apologize for forcing you-all to bring me up here, and I acknowledge fully that it is my fault. . . . I hope that you will never see me again in this context."  Following these statements, the Commission voted to dismiss the proceedings against Judge Shull.

After the April hearing, the Commission determined that the February 2007 charges were "well-founded and of sufficient

gravity to constitute the basis for retirement, censure or removal." The Commission observed that the facts were undisputed that Judge Shull had twice tossed a coin in the courtroom to decide an issue before him and had initiated an ex parte telephone call. The Commission further noted that Judge Shull had admitted that these actions violated the Canons. Additionally, the Commission found by clear and convincing evidence that Judge Shull twice directed Giza to lower her pants in the courtroom, and that he made a statement to the bailiff that demonstrated that Judge Shull had seen Giza's underwear. As a result, the Commission decided to file the present formal complaint in this Court pursuant to Article VI, § 10 of the Constitution of Virginia and Code § 17.1-902.

## II. CANONS OF JUDICIAL CONDUCT

The relevant portions of the Canons at issue in this case are:

Canon 1

A Judge Shall Uphold the Integrity and Independence of the Judiciary.

A. An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of these Canons are to be construed and applied to further that objective.

. . . .

14

Canon 2

A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities.

A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

. . . .

Canon 3

A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently.

. . . .

B.(2) A judge shall be faithful to the law and maintain professional competence in it. . . .

B.(3) A judge shall require order, decorum, and civility in proceedings before the judge.

B.(4) A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity. . . .

. . . .

B.(7) . . . A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding . . . .

### III. ANALYSIS

We first state the Constitutional and statutory authority on which our consideration of these charges is based. When the Commission files a formal complaint in this Court against a

judge, we are charged with the duty to conduct a hearing in open court to determine whether the judge has "engaged in misconduct while in office, or . . . has persistently failed to perform the duties of [the] office, or . . . has engaged in conduct prejudicial to the proper administration of justice." Va. Const. art. VI, § 10. We make this determination by considering the evidence and making factual determinations de novo. Judicial Inquiry & Review Comm'n v. Peatross, 269 Va. 428, 443, 611 S.E.2d 392, 400 (2005); Judicial Inquiry & Review Comm'n v. Lewis, 264 Va. 401, 405, 568 S.E.2d 687, 689 (2002).

We do not accord any particular weight to the Commission's findings or to their credibility determinations. Instead, we give the Commission's findings only such weight as we consider appropriate in the individual case before us. Peatross, 269 Va. at 444, 611 S.E.2d at 400. We employ this approach because the Commission's function is limited to determining whether "the charges [are] well-founded, and sufficient to constitute the basis for retirement, censure, or removal of a judge," thereby resulting in a complaint being filed in this Court. Code § 17.1-902; see also Va. Const. art. VI, § 10; Peatross, 269 Va. at 444, 611 S.E.2d at 400.

Because this type of case invokes the original jurisdiction of this Court, see Va. Const. art. VI, § 1, we conduct an independent review of the record created by the Commission to

16

determine whether there is clear and convincing evidence of a violation of the Canons as charged in the Commission's complaint. Peatross, 269 Va. at 444, 611 S.E.2d 400; see Lewis, 264 Va. at 405, 568 S.E.2d at 689. If we find clear and convincing evidence in the record before us, we are required to censure the judge or to remove the judge from office. Va. Const. art. VI, § 10; Peatross, 269 Va. at 444, 611 S.E.2d at 400. Those are the only sanctions that we may impose. Va. Const. art. VI, § 10; Peatross, 269 Va. at 444, 611 S.E.2d at 400.

The term "clear and convincing evidence" is defined as "that degree of proof which will produce in the mind of the trier of facts a firm belief as to the allegations sought to be established. Such measure of proof is intermediate, more than a mere preponderance but less than is required for proof beyond a reasonable doubt; it does not mean clear and unequivocal." Peatross, 269 Va. at 444, 611 S.E.2d at 400 (quoting Middleton v. Johnston, 221 Va. 797, 803, 273 S.E.2d 800, 803 (1981) (emphasis in original)); see also Lewis, 264 Va. at 405, 568 S.E.2d at 689. The Commission bears the burden of proving its charges by clear and convincing evidence. Peatross, 269 Va. at 444, 611 S.E.2d at 400; Lewis, 264 Va. at 405, 568 S.E.2d at 689.

A. Suspension Hearing

17

As a preliminary matter, Judge Shull raises certain due process arguments concerning the manner in which the Commission conducted the suspension hearing. Judge Shull asserts that the Commission violated his due process rights by effectively shifting the burden of proof and requiring him to present evidence at the suspension hearing, and by refusing his request to cross-examine adverse witnesses whose accounts appeared in the Commission's statement of fact.

We do not reach the merits of these arguments. Our jurisdiction over the formal charges filed in this Court is purely original in nature. See Va. Const. art. VI, § 1; Peatross, 269 Va. at 444, 611 S.E.2d at 400. The Commission, not this Court, is vested with the statutory authority to determine whether a judge should be suspended with pay until resolution of a pending investigation. See Code § 17.1-911. Moreover, neither the Constitution nor the Code has given this Court authority to review the Commission's suspension hearing procedures or the Commission's decision to suspend a judge with pay until final resolution of pending charges. In the absence of constitutional or statutory authority to do so, we are not at liberty to presume such authority. See Board of Supervisors of Fairfax County v. Board of Zoning Appeals of Fairfax County, 271 Va. 336, 344, 626 S.E.2d 374, 379 (2006); America Online, Inc. v. Anonymous Publicly Traded Co., 261 Va. 350, 358, 542 S.E.2d

18

377, 381 (2001); Humphreys v. Commonwealth, 186 Va. 765, 772–73, 43 S.E.2d 890, 894 (1947); Shelton v. Sydnor, 126 Va. 625, 629, 102 S.E. 83, 85 (1920).

We disagree with Judge Shull that our decision in Judicial Inquiry & Review Comm'n v. Elliott, 272 Va. 97, 630 S.E.2d 485 (2006), requires a different result here. In Elliott, we determined that the Commission and a judge charged with misconduct had reached a supervision agreement under the Commission's Rule 15(A)(4) that, if honored by the judge, would foreclose the Commission from filing charges against the judge in this Court. Id. at 121–22, 630 S.E.2d at 497–98. Upon consideration of the record, we further held that because the judge had not violated the agreement, the Commission was foreclosed from bringing a complaint to this Court. Id. at 123, 630 S.E.2d at 498–99. Thus, in Elliott, our determination centered on the question whether the substantive charges filed by the Commission in this Court had already been resolved by the parties' prior agreement.

Judge Shull, however, does not ask us to determine whether the substantive charges filed against him in this Court have already been resolved by proceedings before the Commission. Instead, Judge Shull asks, in the form of a due process challenge, that we address matters over which we have not been given constitutional or statutory authority. In the absence of

19

such authority, Judge Shull's due process challenge effectively requests an advisory opinion concerning matters not subject to our review. See Riverside Hospital, Inc. v. Johnson, 272 Va. 518, 526 n.2, 636 S.E.2d 416, 420 n.2 (2006); Commonwealth v. Harley, 256 Va. 216, 219-20, 504 S.E.2d 852, 854 (1998).

## B. Formal Charges

Judge Shull has admitted many of the facts alleged in the formal charges. He concedes that his actions tossing a coin in the courtroom to resolve a visitation dispute were a violation of the Canons. He also concedes that he violated Canon 3(B)(7) by placing an ex parte telephone call to a hospital during the Giza custody hearing in an attempt to resolve a disputed factual matter.

Judge Shull further has admitted many of the alleged facts concerning the Giza custody hearing, in which Giza was unrepresented by counsel. Judge Shull admitted at the April hearing that before he conducted the two viewings of Giza's thigh, he knew that Giza had been committed to the Marion mental health facility several months earlier as a result of her self-mutilation. Judge Shull also admitted at the April hearing he "initiated" both incidents in which Giza lowered her pants in the courtroom. Finally, Judge Shull conceded at the April hearing that his conduct at the Giza custody hearing violated Canons 2 and 3.

20

The main factual disputes before us concern the sequence of events that culminated in Giza twice lowering her pants in front of Judge Shull. As stated above, Judge Shull testified that, without any direction from him, Giza began to unbutton her pants after it became apparent that she could not reveal her wound by lifting her pants leg. In addition, Keith Giza stated that Giza offered to show her wound before Judge Shull directed her to do so. However, other witnesses, including Castle, Morgan, and Gardner, testified that Giza lowered her pants only after Judge Shull told her she was required to show her wound even though she could do not so by raising her pants leg. Additionally, Castle testified that Giza asked Judge Shull whether she was required to pull her pants down in the courtroom, and that Judge Shull replied that she would have to show the wound if she wanted the protective order to remain in effect.

Several witnesses, including Fleenor, Castle, Gardner, and Morgan, testified that Giza lowered her pants to her knees after Judge Shull first directed her to show her wound. These witnesses also gave graphic testimony concerning the parts of Giza's anatomy that were clearly visible when Giza lowered her pants. Judge Shull and Keith Giza disputed these facts, and maintained that Giza never lowered her pants but merely dropped one side of her open trousers, exposing the wound above her knee.

21

Judge Shull does not dispute that he initiated the second viewing and thought that he could use knowledge gleaned from his father's work as a surgeon to determine at closer range whether Giza had received stitches. Judge Shull also does not dispute that he moved from the bench to the witness' chair to conduct this closer examination of Giza's wound. However, both Judge Shull and Keith Giza contradicted Fleenor's testimony that Giza lowered her pants to her knees after Judge Shull directed her to display her wound again.

Upon our review of these conflicts in the evidence, we find that the version of courtroom events described by Fleenor, Castle, Gardner, and Morgan is persuasive and is more credible than the contrary testimony given by Judge Shull and Keith Giza. The record lacks any plausible explanation why those four witnesses, who had no discernable interest in the outcome of the controversy, would not have been accurate in their description of the courtroom events. Moreover, the degree to which their testimony varied from that of Judge Shull and Keith Giza on these disputed factual issues was substantial and, therefore, cannot be explained as merely differing recollections of the same events.

Accordingly, we find as a matter of fact that Giza lowered her pants in the courtroom because Judge Shull directed her to display her wound after she was unable to expose it by lifting

22

her pants leg.  We also find as a matter of fact that Giza lowered her pants to her knees on both occasions after being directed by Judge Shull to display her wound, and that, as a result, her buttocks were exposed.

Based on the testimony of Fleenor, Castle, Gardner, and Morgan, and the admissions of Judge Shull, we conclude the Commission has met its burden of proving by clear and convincing evidence that Judge Shull committed the three violations of the Canons charged in the Notice of the Commission dated February 9, 2007.  In sum, the three proved violations were: 1) that Judge Shull twice tossed a coin in the courtroom to resolve a visitation dispute; 2) that Judge Shull made an improper ex parte telephone call during a recess in the Giza custody hearing to obtain information on a disputed factual matter; and 3) that Judge Shull twice required Giza to lower her pants in the courtroom during the same custody hearing.[3]

Judge Shull violated the Canons by his conduct because his actions failed to uphold the integrity and independence of the judiciary, and tended to impair public confidence in the integrity and impartiality of the judiciary.  See Canons of Judicial Conduct 1 & 2.  Judge Shull also violated the Canons by

_____

[3] We conclude that it is unnecessary for us to consider the disputed testimony that Judge Shull made certain statements after the Giza custody hearing indicating that he had seen Giza's underwear.

23

failing to maintain and exhibit professional competence in the law, by failing to require decorum and civility in the courtroom, and by failing to be patient, dignified, and courteous to a litigant. See Canons of Judicial Conduct 3(B)(2), (3) & (4). Finally, Judge Shull's action initiating an improper ex parte telephone call also violated the Canons because that action precluded the parties from participating in a disputed matter material to their proceeding. See Canons of Judicial Conduct 3(B)(7).

We further conclude that Judge Shull's violations of the Canons were grave and substantial. A judge's act of tossing a coin in a courtroom to decide a legal issue pending before the court suggests that courts do not decide cases on their merits but instead subject litigants to games of chance in serious matters without regard to the evidence or applicable law. Such conduct may have a profoundly negative impact, not only on the parties' ability to accept the "rule of law" imposed in their particular case, but also on the public's confidence in and respect for the judiciary. In order for our justice system to maintain the confidence and respect of the public, judicial decisions must be based on the evidence and pertinent law. The contrary actions of Judge Shull, reduced to their essence, were actions that denigrated the litigants whose case he decided and subjected our justice system to ridicule.

Judge Shull's actions during the Giza custody hearing were even more egregious. Knowing that Giza had been committed to a mental health facility because she previously had mutilated herself, and in the absence of Giza being afforded the advice of counsel, Judge Shull directed Giza to display her wound when it was apparent that she could not do so without lowering her pants in the courtroom. The "privacy" room divider employed to reduce the size of the courtroom did not prevent anyone involved in the Giza custody hearing from observing Giza's exposed body.

Judge Shull also required Giza to display her wound a second time, fully aware that Giza would again be lowering her pants in the courtroom, with an obvious lack of concern for Giza's personal dignity or the dignity of the judicial proceedings. Judge Shull's initiation of an improper ex parte telephone call during the Giza custody hearing further eroded the integrity of the proceedings by removing the parties, one of whom was not represented by counsel, from participation in a significantly disputed aspect of the case.

We hold that Judge Shull's actions in the two cases, as established by clear and convincing evidence, constitute "misconduct while in office" and "conduct prejudicial to the proper administration of justice." See Va. Const. art. VI, § 10. Thus, we are required either to censure Judge Shull or to

25

remove him from office.  Id.; see Peatross, 269 Va. at 444, 611 S.E.2d at 400.

## C. Disposition

Initially, we note that the record before us contains many letters from attorneys, court personnel, and local citizens, who have written in support of Judge Shull's professional reputation and service to his community.  We have reviewed those submissions as part of our consideration of the proper disposition of this case.

Addressing the issue of disposition, Judge Shull correctly observes that since the Commission was enacted in 1971, only one judge has been removed from office.  In that case, Judicial Inquiry & Review Commission v. Maurice, Record No. 770472 (Sept. 1, 1977), this Court found that a judge misappropriated certain confiscated items, including firearms and alcohol, and consumed confiscated beer with others in the judge's office.  Judge Shull argues that "[i]n light of this authority, it is abundantly clear that Judge Shull's conduct does not rise to the level of a removable offense."

We disagree that the matter can so easily be resolved. While the conduct of Judge Maurice was completely deplorable, and likely involved criminal activity, his conduct did not affect any litigants or the administration of justice in a courtroom of this Commonwealth.

26

In contrast, the essence of Judge Shull's judicial misconduct has been his disregard for the dignity of litigants appearing before him and for the dignity of the judicial process. Judge Shull's actions involved two separate cases. In tossing a coin to resolve a matter before him, he denigrated both the litigants and our justice system. By directing Giza to lower her pants twice in the courtroom, Judge Shull ignored the dignity of a litigant who was not represented by counsel and who had a clear history of mental instability. Such actions on the part of a judge necessarily impair public confidence in the integrity of our justice system. Unless our citizens can trust that judges will fairly resolve the disputes brought before our courts, and treat all litigants with dignity, our courts will lose the public's respect and confidence upon which our legal system depends.

Although Judge Shull's improper ex parte communication during the Giza custody hearing, standing alone, would not merit additional discussion, we must consider it in the larger context of the courtroom proceedings. In that context, the ex parte communication serves to illustrate again Judge Shull's lack of concern for litigants appearing before him.

We also must observe that, in May 2004, Judge Shull appeared before the Commission in an informal proceeding in which several allegations were considered, including that he did

not treat some litigants in his courtroom with respect.  We are particularly concerned with Judge Shull's admission at the 2004 hearing that he "probably" advised a female litigant, who alleged that her boyfriend had inflicted bruises on her, that "if you married this guy, it would remove an impediment [regarding custody of your children]."  We also are concerned about Judge Shull's statement at the 2004 hearing that in a case involving a 14-year old boy, he "may have said the evidence does show that you are a bit of a mama's boy, and this is part of the problem here."

At the time the Commission dismissed these allegations, the Commission's chairman stated, "You haven't been a full-time judge for very long, and the Commission is hopeful that this is the initial learning process that is going to help you sort everything out."  By its action, the Commission plainly gave Judge Shull the opportunity to change his future conduct and to treat litigants with due respect.

We are forced to observe that Judge Shull did not heed the Commission's advice but has continued to demean litigants appearing before him.  The misconduct before us in the present charges indicates that Judge Shull's courtroom conduct has become far worse than it was when he first appeared before the Commission in 2004.  Therefore, to ensure that all citizens will be able to have full confidence they will be treated fairly and

28

accorded their rightful dignity in all future legal proceedings in the Thirtieth Judicial District, this Court will order that James Michael Shull be removed immediately from the office of Judge of the Thirtieth Judicial District, pursuant to Article VI, § 10, of the Constitution of Virginia.

Removal ordered.

29