PRESENT: Lemons, C.J., Goodwyn, McClanahan, Powell, Kelsey, and McCullough, JJ., and Lacy, S.J.

JUDICIAL INQUIRY AND REVIEW COMMISSION

OPINION BY
v. Record No. 170133                                  CHIEF JUSTICE DONALD W. LEMONS
                                                      JULY 20, 2017

RUDOLPH BUMGARDNER, III, SENIOR JUDGE, AND
HUMES J. FRANKLIN, JR., RETIRED JUDGE OF THE
TWENTY-FIFTH JUDICIAL DISTRICT


       The Judicial Inquiry and Review Commission (the "Commission") filed the present

complaint against Rudolph Bumgardner, III, Senior Judge of the Court of Appeals ("Judge

Bumgardner"), and Humes J. Franklin, Jr., Retired Judge of the Twenty-Fifth Judicial Circuit

("Judge Franklin"), pursuant to the original jurisdiction of this Court set forth in Article VI,

Section 10 of the Constitution of Virginia and Code § 17.1-902. The Commission asserted that

its charges against Judge Bumgardner and Judge Franklin for allegedly violating the Canons of

Judicial Conduct (the "Canons"), as set out in Part 6, Section III of the Rules of the Supreme

Court of Virginia, are well founded in fact, and that the violations are "of sufficient gravity to

constitute the basis for censure or removal" by this Court. We conclude that there is not clear

and convincing evidence that Judge Bumgardner and Judge Franklin engaged in either

"misconduct" or "conduct prejudicial to the proper administration of justice." Va. Const. art. VI,

§ 10. Therefore, we will dismiss the complaint.

                                      I.   Facts and Proceedings

       On November 9, 2016, the Commission issued Notices establishing formal charges

against Judge Bumgardner and Judge Franklin, alleging that they had engaged in misconduct and

conduct prejudicial to the proper administration of justice while serving respectively as a senior

judge and as a retired judge subject to recall. Both judges were charged with violations of Canons 1, 2A, 2B, 4D(1), and 5A(1).

A. The Notice

The Commission alleged that both judges were founding members and leaders of the Augusta Citizens Coalition (the "Coalition"), a referendum committee registered with the Virginia Department of Elections, the purpose of which was to defeat a public referendum on the question whether to move the Augusta County courthouse out of the City of Staunton and into the County. The public referendum was scheduled for November 8, 2016, and was on the general election ballot. According to the Commission, both judges contributed money to the Coalition. The Coalition also paid McGuireWoods Consulting $35,000 for public relations work on this matter. The Commission alleged that both judges participated in town hall meetings and worked a booth at the county fair and advocated for one side of this issue. Both judges also attended a Rotary Club meeting in October 2016, where Judge Bumgardner spoke out publicly against relocating the courthouse. Judge Franklin publicly endorsed one side of this issue in an interview in a local newspaper, *The News Virginian*. The Commission further alleged that both judges also publicly advocated a position on this issue in a joint opinion piece that appeared in the local newspaper on October 30, 2016, and again on November 1, 2016. Judge Bumgardner also worked at a tent set up outside the entrance to the courthouse, speaking to the public and participating in courthouse tours. According to the Commission, Judge Bumgardner also sent invitations to various people who had worked to defeat the referendum, to attend a celebratory cocktail party at his house after the election. On November 8, 2016, he cancelled the party after his attorney spoke to Commission Counsel.

The referendum was defeated by a vote of 23,969 to 11,784.

## B. The Judges' Answers

Judge Bumgardner and Judge Franklin filed answers to the Notices. They admitted the factual allegations, with a few exceptions. Both judges denied being "founding members" and "leaders" of the Coalition, but instead asserted they were part of a group of nine citizens opposed to moving the courthouse that registered with the state using that name. They disputed having any official or unofficial capacity in the Coalition's leadership. Judge Bumgardner also denied attending any town hall meetings, although he admitted setting up signs and speaking to people outside one of the town hall meetings. Both judges asserted that they believed the Canons clearly authorized their conduct, as they considered the location of the courthouse to be a matter concerning the law, the legal system, and the administration of justice. The judges did not consider their actions to be political activity as this was a limited issue referendum and did not involve a partisan candidate or political party. They believed that they each had unique insight on this issue based on their knowledge of how the local legal system operated since they had both previously served as Chief Judge of that court, and could assist the public by educating them on the matter. They also both argued that they had nothing personally to gain from the location of the courthouse, and they did not believe that the Augusta Citizens Coalition was a "political organization" since it did not involve a candidate for public office or a political party.

## C. The Commission Hearing

The Commission conducted an evidentiary hearing on December 13, 2016, which was held jointly at the judges' request. At the hearing, Commission counsel called a member of the Augusta County Board of Supervisors, Carolyn Bragg ("Bragg"), to testify. Bragg testified that Judges Bumgardner and Franklin never came to a Board meeting to discuss the issue of the courthouse location, although she saw them at town hall meetings and working a booth at the

3

county fair and outside the courthouse. Bragg admitted that the Board was in favor of moving the courthouse and had voted 7-1 in support of that move, which was why they sought the public referendum. Bragg was asked if she considered the relocation of the courthouse to be a "political issue," and she responded "no." Later, however, she testified that within Augusta County this had become a "political issue," even though the Board had not approached it as such. Bragg also testified that after observing the judges' conduct during the referendum campaign, she would not feel comfortable appearing before either judge as a litigant.

Commission counsel introduced certain exhibits regarding the Coalition that showed the judges had contributed money to the Coalition and that they had been copied on all of the planning emails from McGuireWoods Consulting to the nine members of the Coalition. The exhibits also demonstrated that the Coalition was registered with the Virginia Department of Elections ("VDE") as a "referendum committee," and with the IRS as a "political organization" for tax-exempt status under 26 U.S.C. § 527. The VDE definition of a "political committee" was also introduced as an exhibit, which included referendum committees, as well as political action committees, political party committees, and inaugural committees.

Commission counsel rested, and the judges moved to strike the evidence and terminate the proceedings. The judges argued that their actions did not violate the Canons since all of their efforts were related to the location of the courthouse, and the efficiency of the local court system and the administration of justice. Commission counsel argued that these two judges formed a political organization, made contributions to this organization, and were involved in running a political campaign to defeat the referendum, which actions violated the Canons. However,

4

during her argument, counsel conceded that their actions did not violate Canon 4D(1),[1] but contended that, instead, their actions violated Canons 1, 2, and 5. The Commission denied the motion to strike.

The judges called Joanie Eiland to testify, who was one of people who started the Coalition. She testified that, as a local business owner, she was concerned about the potential economic impact the courthouse relocation might have on Staunton and Augusta. She asked the judges "to join the conversation" in order to help educate the public about the courthouse relocation. Eiland testified that the Coalition did not endorse any political candidates nor did it require loyalty oaths, and that its purpose was educational in nature. Eiland was asked about one of the emails sent from McGuireWoods Consulting to Coalition members, which asked them to keep confidential "any outreach and intel provided on this issue to/from GOP leaders, tea party leaders, public officials, etc." A Commission member asked why the email only referenced the "GOP" and the "tea party," and not Democrats, to which Eiland responded, "I can't comment on what was intended by that reference."

Judge Bumgardner testified that the reason he decided to become engaged in the referendum was because back in 2002, he had been the chairman of a courthouse study committee. This committee, which also included Judge Franklin, had examined the needs of the Augusta County courthouse and considered issues surrounding relocation. The committee followed the Virginia Courthouse Facilities Guidelines and recommended against relocating and building a new facility. Judge Bumgardner explained that he was concerned the public was not being educated on the issues surrounding the relocation, including the findings of the 2002 study.

---

[1] In her closing argument, Commission counsel clarified that she believed Canon 4D(1) did not apply to the facts of this case because the judges never appeared before or consulted with the executive or legislative branches of government on this issue.

He testified that the only reason the Coalition was officially created was so that they would be allowed to speak on the referendum. He stated that when he donated money, he considered it similar to giving money to Legal Aid, in support of the legal system. He believed that the County benefitted by having its courts in Staunton because both courts could share services, and that was the reason he wrote the op-ed for the newspaper. Judge Bumgardner testified that although he donated money to the Coalition, he never raised money for it. He stated that he believed everything he did was permitted by the Canons, and that he did not believe he did anything "political" with regard to the referendum. On cross-examination, Judge Bumgardner testified that he believed the Coalition was an organization "dedicated to the improvement of administration of justice."

Judge Franklin testified that he became involved with the 2016 referendum because he was concerned that information from the 2002 courthouse study was not being shared with the public, and because he believed that the current location of the courthouse made the local legal system operate more efficiently. He was invited by Eiland to speak to some businessmen about how the courts functioned and about the referendum. He began attending meetings of that informal group, which became the Coalition. He testified that the Coalition was not an active supporter of any particular candidate. He admitted attending public information meetings on the referendum at a local high school. Judge Franklin admitted that he contributed money to the Coalition but denied soliciting funds from anyone else. He testified that he never intended to become involved in a political organization. He believed he had a right to speak on what he considered to be a matter involving the administration of justice.

Judge Bumgardner and Judge Franklin admitted they wrote editorials regarding how the local court systems functioned, and how the relocation of the courthouse would affect the court

6

systems. Another citizens group opposed to the relocation of the courthouse, Commonsense Courthouse Solutions, highlighted one of these editorials on its website under the heading "Endorsements." However, both judges testified that they had no knowledge this was to happen and did not consent to it.

During closing arguments, Commission counsel argued that the Coalition was a political organization, and the judges violated Canons 1, 2, and 5 by their involvement with the Coalition and the courthouse referendum. She argued that the judges had made their involvement a public issue; consequently, the Commission had no choice other than to refer this matter to the Supreme Court for a public decision. The judges' counsel responded that a matter should only go to the Supreme Court if it was of sufficient gravity, not because it had been made public. The judges' counsel reiterated that the Coalition was not a political organization and that the judges were permitted to speak publicly on this matter as it clearly fell within the exception to Canon 5.

At the conclusion of the hearing, the Commission dismissed the charge against the judges of violating Canon 4D(1), but found that the charges that the judges had violated Canons 1, 2A, 2B, and 5A(1) were "well-founded and of sufficient gravity to constitute the basis for retirement, censure, or removal." The Commission concluded that a formal complaint should be filed in the Supreme Court of Virginia, with a recommendation of censure.

On January 27, 2017, the Commission filed its formal complaint in this Court. The judges then filed a demurrer, motion to dismiss, and answer. The Commission filed an opposing response to the demurrer and motion to dismiss.

## II. Analysis

The filing of a formal complaint by the Commission triggered this Court's duty to conduct a hearing to determine whether Judge Bumgardner and Judge Franklin "engaged in

misconduct while in office, or that [they] ha[ve] persistently failed to perform the duties of [their] office, or that [they] have engaged in conduct prejudicial to the proper administration of justice." Va. Const. art. VI, § 10. We have explained that

> In conducting the hearing on the formal complaint filed by the Commission, this Court considers the evidence and makes factual determinations de novo. The Commission must prove its charges in this Court by clear and convincing evidence. The term "clear and convincing evidence" has been defined as "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases. It does not mean clear and unequivocal."

*Judicial Inquiry & Review Comm'n v. Waymack*, 284 Va. 527, 534-35, 745 S.E.2d, 410, 414 (2012) (citation omitted). Further, this Court does not accord any particular weight or deference to factual determinations, findings and opinions of the Commission. *Id.* If after conducting an independent review of the record and hearing argument of counsel, we find clear and convincing evidence that a judge's actions or conduct violated the Canons, i.e., that the judge's actions were of sufficient gravity as to amount to misconduct while in office, persistent failure to perform the duties of the office, or conduct prejudicial to the proper administration of justice, we shall censure or remove the judge from office. *Id.* at 535, 745 S.E.2d at 414; *see also Judicial Inquiry & Review Comm'n v. Peatross*, 269 Va. 428, 450, 611 S.E.2d 392, 404 (2005).

## A. Canon 5

The judges were charged with violating Canon 5A(1). Canon 5 states that:

> A Judge Shall Refrain From Political Activity Inappropriate to the Judicial Office
>
> A. *Political Conduct in General.*
>
> (1) A judge shall not:

8

(a) act as a leader or hold any office in a political organization;

(b) make speeches for a political organization or candidate or publicly endorse or oppose a candidate for public office; or

(c) solicit funds for or pay an assessment or make a contribution to a political organization or candidate, attend political gatherings, or purchase tickets for political party dinners, or other political functions.

(2) A judge shall resign his office when he becomes a candidate either in a party primary or in a general election for a public office, except that he may continue to hold his judicial office while being a candidate for election to or serving as a delegate in a state constitutional convention, if he is otherwise permitted by law to do so.

(3) A judge shall not engage in any other political activity except in behalf of measures to improve the law, the legal system, or the administration of justice.

The judges do not dispute that they made monetary contributions to the Coalition. The record also demonstrates that the judges were members of the Coalition, and that they spoke publicly on behalf of the Coalition and against the relocation of the courthouse in various settings. The central question before us is whether the Coalition is a "political organization" within the meaning of Canon 5.

The judges urge this Court to consider the definition of "political organization" contained in the ABA's Model Code of Judicial Conduct. The ABA defines a political organization as:

A political party or other group sponsored by or affiliated with a political party or candidate, the principal purpose of which is to further the election or appointment of candidates for political office.

American Bar Association, Annotated Model Code of Judicial Conduct 11 (2d ed. 2011).

Similarly, the Code of Conduct for federal judges explains that:

The term "political organization" refers to a political party, a group affiliated with a political party or candidate for public office, or an

9

> entity whose principal purpose is to advocate for or against
> political candidates or parties in connection with elections for
> public office.

U.S. Courts, Code of Conduct for United States Judges (2014).

The Commission argues that we should decline to adopt the ABA definition, asserting that it is too narrow. The Commission relies on a dictionary definition of "political" indicating that it means "of or relating to government, a government, or the conduct of government affairs," and argues that the Coalition falls within that definition. *See* Webster's Third New International Dictionary 1755 (1993). The Commission contends that Canon 5 should be applied in a manner to guarantee the broadest application. The Commission further asserts that the Coalition was clearly a political organization, as it was organized and recognized as such under Virginia' election laws and the IRS's tax laws.

Neither the Canons nor the Code of Virginia expressly define the term "political organization." Code § 24.2-945.1 sets forth the definitions of terms used in the Campaign Finance Disclosure Act of 2006, and it states that a "political committee" "means and includes any political action committee, political party committee, referendum committee, or inaugural committee." Code § 24.2-945.1(A). It defines a "referendum committee" as:

> any organization, person, group of persons, or committee, that
> makes expenditures in a calendar year in excess of (i) $10,000 to
> advocate the passage or defeat of a statewide referendum, (ii)
> $5,000 to advocate the passage or defeat of a referendum being
> held in two or more counties and cities, or (iii) $1,000 to advocate
> the passage or defeat of a referendum held in a single county or
> city.

The Coalition was a registered "referendum committee." Any group that wishes to advocate the passage or defeat of a referendum in a county and that makes more than $1,000 in expenditures

10

is required to register as a referendum committee, and the Coalition complied with that requirement.

Code § 24.2-949.9:1(E) requires any organization that meets the IRS' definition of "political organization" to file a statement of organization and the lists of contributors. The IRS definition, which is set forth in 26 U.S.C. § 527(e), states:

> (1) Political organization. The term "political organization" means a party, committee, association, fund, or other organization (whether or not incorporated) organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both, for an exempt function.
> (2) Exempt function. The term "exempt function" means the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office or office in a political organization, or the election of Presidential or Vice-Presidential electors, whether or not such individual or electors are selected, nominated, elected, or appointed. Such term includes the making of expenditures relating to an office described in the preceding sentence which, if incurred by the individual, would be allowable as a deduction under section 162(a) [26 U.S.C. § 162(a)].

South Carolina, the only other state like Virginia where the legislature elects judges, defines "political organization" as a "political party or other group, the principal purpose of which is to further the election or appointment of candidates to political office." S.C. App. Ct. R., pt. V, Rule 501: Code of Judicial Conduct, "Terminology."

Although an issue referendum regarding the relocation of a courthouse is certainly "of or relating to government, a government, or the conduct of government affairs," we reject such a broad reading of the term "political organization." However, we also reject the judges' suggestion that we adopt the ABA Model Code definition, as that definition is too narrow. As pointed out in the Commission's briefs, many issue referenda are not specifically tied to a political party or the election of a candidate for public office, and yet involve issues where a

11

judge's public advocacy and membership in a referendum committee would be inappropriate. During his testimony, Judge Bumgardner agreed that it would be improper for a judge in Virginia to campaign on behalf of various bond issues or constitutional amendments. (App. 769-70). Accordingly, we cannot adopt a definition of "political organization" that would categorically exempt all referendum committees.

The location and condition of court facilities, however, are issues inextricably intertwined with the administration of justice. The General Assembly has given judges the extraordinary power to issue a writ of mandamus against the supervisors of a county or the members of a city council in order to force local governments "to cause the court facilities of such county or city to be made secure, or put in good repair, or rendered otherwise safe as the case may be, and … to cause the necessary work to be done." Code § 15.2-1643(A). If judges may initiate lawsuits against localities, and force localities to make improvements to court facilities, it would seem reasonable that a judge could speak about the impact a courthouse relocation would have on the administration of justice in that locality. The text of Canon 5, that "a judge shall refrain from political activity *inappropriate* to the judicial office," presupposes that that there might be some things that constitute "political activity" but are nonetheless not "inappropriate to the judicial office." Considering judges' responsibilities over court facilities under Code § 15.2-1643, the involvement of local judges in a public debate over the possible relocation of a courthouse is not "inappropriate to the judicial office."

The Preamble to the Canons sets forth that the Canons "are rules of reason. They should be applied consistent with constitutional requirements, statutes, other court rules and decisional law and in the context of all relevant circumstances." Va. Sup. Ct. R. pt. 6, sec. III, Preamble (2017). Analyzing Canon 5 under this directive, considering the statutory responsibilities of

12

judges regarding the relocation of courthouses and the circumstances of this case, we hold that the Coalition is not the type of "political organization" embraced within the meaning of Canon 5. Accordingly, we hold that the involvement of Judge Bumgardner and Judge Franklin with, and actions taken by them on behalf of the Coalition, including their monetary donations to the Coalition, did not violate Canon 5A(1). Therefore, we will dismiss this charge.

## B. Canons 1 and 2

The judges were also charged with violating Canons 1 and 2. Canon 1 states:

> A Judge Should Uphold the Integrity and Independence of the Judiciary.
>
> A. An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of these Canons are to be construed and applied to further that objective.

Canon 2 states in relevant part:

> A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities.
>
> A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
>
> B. A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify as a character witness.

The Commission's complaint in this Court states that it found the charges based on violations of Canons 1, 2A, and 2B (along with Canon 5A(1)) to be well-founded. The judges

13

argue that the Commission has waived any claimed violation of Canons 1 and 2 by failing to provide any argument as to how the judges violated these two Canons. The judges argue that just like an appellant who fails to brief an assignment of error, by failing to brief these two separate Canons, the Commission has waived these issues.

The judges are correct that the Commission's brief never directly addresses how the specific evidence in this case supports a violation of Canons 1 and 2. Although in its reply brief the Commission cites numerous pages where it contends it made arguments in support of a violation of Canons 1 and 2, a review of those pages simply does not support the Commission's assertion. The Commission is required to prove each violation by "clear and convincing evidence." *Waymack*, 284 Va. at 535, 745 S.E.2d at 414. By failing to set forth any argument regarding how the facts of this case support a violation of Canons 1 and 2, the Commission has failed to meet its burden of proof and has waived these charges.[2]

### C. Demurrer and Motion to Dismiss

We have stated that upon the Commission's filing of a complaint, this Court has a constitutional duty to conduct a hearing in open court:

> When the Commission files a formal complaint in this Court against a judge, we are charged with the duty to conduct a hearing in open court to determine whether the judge has "engaged in misconduct while in office, or … has persistently failed to perform the duties of [the] office, or … has engaged in conduct prejudicial to the proper administration of justice." Va. Const. art. VI, § 10.

*Judicial Inquiry and Review Comm'n v. Shull,* 274 Va. 657, 669-70, 651 S.E.2d 648, 655 (2007).

The judges asserted in their demurrer and motion to dismiss that they were not trying to avoid a

---

[2] We further note that the Commission's failure to clearly set forth argument in support of how the facts of this case support a violation of Canons 1 and 2 also put Judge Bumgardner and Judge Franklin at a disadvantage because they had no specific argument to which they could respond.

14

hearing on the merits.  However, by their very nature, demurrers and motions to dismiss are pleadings designed to obtain dismissal of a charge or complaint prior to a trial or hearing on the merits.  As we have previously held, a demurrer and motion to dismiss to avoid a hearing on the merits are improper pleadings in proceedings upon a complaint filed by the Judicial Inquiry and Review Commission.  *Judiciary Inquiry and Review Comm'n v. Waymack,* Record No. 120398 (July 27, 2012) (unpublished).  Accordingly, the demurrer will be overruled and the motion to dismiss on the pleadings will be denied.

### III.  Conclusion

For the reasons stated, we hold that there is not clear and convincing evidence showing that Judge Bumgardner and Judge Franklin violated the specified Canons as charged.  Their actions did not amount to judicial misconduct or conduct that was prejudicial to the proper administration of justice warranting censure or removal from office under Canon 5, and the Commission waived the charges under Canons 1 and 2.

Having resolved the issues presented in this appeal based upon principles of constitutional and statutory construction that are well established under Virginia law, as well as application of our appellate rules, it is unnecessary to address the judges' arguments relating to the First Amendment of the United States Constitution. *See, e.g.*, *Hampton Rds. Bankshares, Inc. v. Harvard*, 291 Va. 42, 52, 781 S.E.2d 172, 177 (2016) (declining to reach parties' claim based on putative violation of Takings Clause of the Fifth Amendment to the Constitution of the United States where the case could be resolved without reaching the constitutional issues, because the Court "strive[s] to decide cases on the 'best and narrowest grounds available'") (quoting *Alexandria Redevelopment & Hous. Auth. v. Walker*, 290 Va. 150, 156, 772 S.E.2d 297, 300 (2015)); *Commonwealth v. Swann*, 290 Va. 194, 196, 776 S.E.2d 265, 267 (2015) (collecting

cases) (observing that a fundamental tenet of the well-established doctrine of judicial restraint "is that 'unnecessary adjudication of a constitutional issue' should be avoided").

Upon consideration of the entire record, we will dismiss the complaint.

*Dismissed.*